873 So.2d 1182 (2003)
CLAY ELECTRIC COOPERATIVE, INC., etc., Petitioner,
v.
Delores JOHNSON, et al., Respondents.
Clay Electric Cooperative, Inc., etc., Petitioner,
v.
Lance, Inc., etc., et al., Respondents.
Nos. SC01-1955, SC01-1956.
Supreme Court of Florida.
December 18, 2003.
Rehearing Denied May 13, 2004.
*1183 William T. Stone of Cole, Stone, Stoudemire & Morgan, Jacksonville, FL, for Petitioner.
Stephen J. Pajcic and Thomas F. Slater of Pajcic & Pajcic, P.A., William A. Bald of Dale, Bald, Showalter & Mercier, P.A., and Dennis R. Schutt of Schutt Humphries, Jacksonville, FL, for Respondents.
Charles T. Wiggins and R. Andrew Kent of Beggs & Lane, LLP, Pensacola, FL, for Gulf Power Company, Amicus Curiae.
Joel D. Eaton of Podhurst, Orseck, Josefsberg, Eaton, Meadow, Olin & Perwin, P.A., Miami, FL, for the Academy of Florida Trial Lawyers, Amicus Curiae.
Timothy C. Conley and David W. McCreadie of Lau, Lane, Pieper, Conley & McCreadie, P.A., Tampa, FL, for Tampa Electric Company and Edison Electric Institute, Amici Curiae.
SHAW, Senior Justice.
We have for review Johnson v. Lance, Inc., 790 So.2d 1144 (Fla. 1st DCA 2001) (hereinafter "Johnson"), and Lance, Inc. v. Johnson, 790 So.2d 1163 (Fla. 1st DCA 2001) (hereinafter "Lance"), based on conflict with Martinez v. Florida Power & Light Co., 785 So.2d 1251 (Fla. 3d DCA *1184 2001) (hereinafter "Martinez"), review granted, 819 So.2d 137 (Fla.2002). We have jurisdiction. Art. V, § 3(b)(3), Fla. Const.

I
While fourteen-year-old Dante Johnson was walking to his school bus stop during the early morning darkness on September 4, 1997, he was struck and killed by a truck in an area where a streetlight was inoperative. Dante's grandmother, Delores Johnson, who was Dante's caregiver, came upon the boy's "mangled, bloodied body" at the scene and fainted. She later filed a negligence claim against the following defendants: the truck's driver ("Ganas"), the truck's owner ("Lance"), and the streetlight maintenance company ("Clay Electric"). Dante's estate also filed suit against the same defendants and the two cases were consolidated.
Clay Electric filed an answer to the plaintiffs' complaint and subsequently moved for summary judgment, which was granted:
The undisputed material facts, for purposes of this Order, after all reasonable inferences are resolved in favor of the other parties opposing the pending motion, are as follows:
(A) The decedent, Dante Johnson, was struck by a motor vehicle being driven by Defendant Larry Ganas. The collision occurred while the decedent walked on or near a public street.
(B) The collision occurred during the early morning hours while it remained very dark. The decedent was wearing dark clothing and was walking in the same direction that Defendant Ganas was driving.
(C) Defendant Ganas was alert and operating his vehicle in a prudent manner and his headlights were on and operating properly. His vision was not impaired or obstructed. Despite these facts, he was unable to see the decedent in time to take evasive actions that would have avoided the collision due to the extreme darkness at the site of the collision.
(D) Several years before the subject collision, the Jacksonville Electric Authority had installed lights along the street where the decedent was struck and killed.... Also, several years before the subject collision, Defendant Clay Electric entered into a contract with the Jacksonville Electric Authority which required that Defendant Clay Electric maintain the lights. That contract remained in force at the time of the collision and Defendant Clay Electric had been paid to maintain the lights.
(E) If the lights had been operating properly, Defendant Ganas would have seen the decedent in time to avoid the collision. The light nearest the site of the collision was not illuminated and it had not been illuminated for [some time] prior to the collision. Defendant Clay Electric, although being contractually obligated to maintain the light and having been paid to do so, failed to maintain the light. Defendant Clay Electric never instituted a system to regularly inspect the lights at night or to determine which lights needed replacement bulbs or repairs.
(F) The Court, having read the cases cited by the parties, concludes the Defendant Clay Electric did not have a legally recognized obligation to maintain the subject light for the benefit of the decedent.
Both Johnson and Dante's estate appealed, and Lance filed a separate appeal.
The district court in Johnson addressed Johnson's and the estate's appeal and reversed. The district court in Lance then *1185 addressed Lance's appeal and ruled in conformity with Johnson. Clay Electric sought review of both Johnson and Lance based on conflict with Martinez, another streetlight "maintenance" case wherein the district court affirmed the trial court's judgment on the pleadings in favor of the electric company. Martinez sought review. We granted review in Johnson, Lance, and Martinez, consolidated Johnson and Lance, and reviewed Martinez separately. The issue posed in the present cases is whether, for purposes of this summary judgment, Clay Electric owed the plaintiffs a legally recognized duty to use reasonable care in maintaining the streetlights.

II

A
Florida Rule of Civil Procedure 1.510 sets forth the following criteria governing motions for summary judgment:
The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.
Fla. R. Civ. P. 1.510(c). A summary judgment deprives a party of his or her right to trial and must be exercised with restraint; any doubts must be resolved in favor of the nonmoving party.[1] A trial court's ruling on a motion for summary judgment posing a pure question of law is subject to de novo review.[2]
Although the present cases involve an alleged contract between Clay Electric and the Jacksonville Electric Authority ("JEA"), the suits themselves are based on an allegation of negligence and the claims thus sound in tort. Traditionally, a cause of action based on negligence comprises four elements:
1. A duty, or obligation, recognized by the law, requiring the [defendant] to conform to a certain standard of conduct, for the protection of others against unreasonable risks.
2. A failure on the [defendant's] part to conform to the standard required: a breach of the duty....
3. A reasonably close causal connection between the conduct and the resulting injury. This is what is commonly known as "legal cause," or "proximate cause," and which includes the notion of cause in fact.
4. Actual loss or damage....
Prosser and Keaton on the Law of Torts 164-65 (W. Page Keeton ed., 5th ed.1984).
The principle of "duty" is linked to the concept of foreseeability and may arise from four general sources:
(1) legislative enactments or administration regulations; (2) judicial interpretations of such enactments or regulations; (3) other judicial precedent; and (4) a duty arising from the general facts of the case.
McCain v. Fla. Power Corp., 593 So.2d 500, 503 n. 2 (Fla.1992). The present cases fall within the fourth category, i.e., the duty arises "from the general facts of the case." To the extent the parties rely on an alleged contract between Clay Electric and JEA to support the proposition that Clay Electric owed, or did not owe, a legal duty to Dante, the contract itself is but one facet of the general facts of the case.

*1186 B
Whenever one undertakes to provide a service to others, whether one does so gratuitously or by contract, the individual who undertakes to provide the servicei.e., the "undertaker"thereby assumes a duty to act carefully and to not put others at an undue risk of harm.[3] This maxim, termed the "undertaker's doctrine," applies to both governmental[4] and nongovernmental entities.[5] The doctrine further applies not just to parties in privity with one anotheri.e., the parties directly involved in an agreement or undertaking but also to third parties. Florida courts have applied the doctrine to a variety of third-party, contract-based negligence claims and ruled that the defendants could be held liable, notwithstanding a lack of privity.[6]
Section 324A of the Restatement sets forth the following standard for assessing liability in such cases:
One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
(a) his failure to exercise reasonable care increases the risk of such harm, or
(b) he has undertaken to perform a duty owed by the other to the third person, or
(c) the harm is suffered because of reliance of the other or the third person upon the undertaking.
Restatement (Second) of Torts § 324A (1965).
This Court utilized the above standard in Union Park Memorial Chapel v. Hutt, 670 So.2d 64 (Fla.1996), wherein a husband and wife sued a funeral home after the wife was injured in a traffic accident while participating in a funeral procession. The Court determined that the funeral home's actions in supervising the procession implicated both subsections (a) and (c), relating to "increased risk" and "reliance" respectively. The Court then held that, notwithstanding a lack of privity between the plaintiffs and the funeral home, the funeral home owed the plaintiffs a legal duty to act with reasonable care.

III
In the present cases, we conclude that the trial court erred in granting Clay Electric's motion for summary judgment. Viewing the record, the undisputed facts, and all reasonable inferences therefrom in the light most favorable to the nonmoving parties, we hold that the plaintiffs have adequately shown that Clay Electric assumed a specific, legally recognized duty to the plaintiffs to act with due care in maintaining the streetlights.
*1187 First, long before the present accident took place, the City of Jacksonville determined that the 8500 block of Collins Road needed lighting, and streetlights subsequently were installed. When Clay Electric undertook the maintenance of those lights, the company should have foreseen that proper maintenance was necessary for the protection of the plaintiffs. The streetlight at issue was located in a residential neighborhood, on a major roadway, and on the pathway to a school bus stop. There were no sidewalks in the area and the local children, on a daily basis, walked in the early morning darkness in the grassy strip along the roadway's edge directly past the streetlight on their way to the bus stop.
Second, Clay Electric neglected to exercise due care in maintaining the streetlights. As noted above, the trial court found:
(E) If the lights had been operating properly, Defendant Ganas would have seen the decedent in time to avoid the collision. The light nearest the site of the collision was not illuminated and it had not been illuminated for [some time] prior to the collision. Defendant Clay Electric, although being contractually obligated to maintain the light and having been paid to do so, failed to maintain the light. Defendant Clay Electric never instituted a system to regularly inspect the lights at night or to determine which lights needed replacement bulbs or repairs.
Thus, at the time of the accident, Clay Electric had not instituted even the most rudimentary maintenance procedures.
And third, both the "increased risk" and "reliance" subsections are implicated here. Clay Electric's failure to exercise due care in maintaining the streetlights caused the roadway to be cast in darkness, thus increasing the risk that Ganas would be unable to see Dante. Further, Clay Electric, in undertaking to maintain the streetlights, arguably caused Delores Johnson to rely on the fact that the lights would be operating properly and that Dante's pathway to the school bus stop would be lighted. On this record, both "increased risk" and "reliance" pose viable issues to be decided by the trier-of-fact.

IV

A
Clay Electric first contends that the "increased risk" subsection is inapplicable here because Dante was no worse off with an inoperative streetlight than he would have been with no light at all. This claim, however, misses the point. The plaintiffs did not allege that Clay Electric negligently installed the streetlights on an otherwise unlighted street. Rather, they alleged that Clay Electric negligently maintained the streetlights on an otherwise lighted street. Construing the present record in the light most favorable to the plaintiffs, it appears that Clay Electric undertook the maintenance of operative streetlights on Collins Road, and it was the company's subsequent negligence that resulted in the roadway being cast in darkness. This raises a jury question as to whether Clay Electric's negligence increased the risk of harm to Dante.
We reject Clay Electric's claim that our ruling will force utilities to continue their services in perpetuum once they undertake to maintain streetlights. The Massachusetts Superior Court in Ahmed v. Burns, 12 Mass. L. Rptr. 191, 2000 WL 1511756 (Super.Ct.2000), noted that the municipality there took the following approach to a similar problem:
In 1991, as a cost saving measure, the town decided to turn off every other street light along Main Street, and instructed *1188 the [electric company] to do so. The street lights which were turned off were marked with orange caps so that the [electric company] and the town could identify the lights that were intentionally turned off.
Id. The court then ruled that the town's decision "concerning the number of streetlights to turn on or off ... would be a discretionary decision that is exempt from [liability]" under the Massachusetts Tort Claims Act. Florida courts have recognized a similar exemption from liability for certain "discretionary" governmental acts.[7]

B
Clay Electric also contends that the "reliance" subsection is inapplicable here because the record contains insufficient proof that the plaintiffs relied on the company's actions. We disagree. Although witnesses stated that several streetlights in the area had been inoperative long before the present accident took place, nothing suggests that this fact was conveyed to, or known by, Dante's caregiver. Instead, the record, when viewed in the light most favorable to the plaintiffs, raises a jury question as to whether Clay Electric, in undertaking the maintenance of operative streetlights in Dante's neighborhood, induced Delores Johnson to forgo other precautions for Dante, such as driving him, or walking with him, to the school bus stop.[8]

C
Clay Electric next contends that, under the reasoning of H.R. Moch Co. v. Rensselaer Water Co., 247 N.Y. 160, 159 N.E. 896 (1928), Clay Electric is immune from liability to third parties. We disagree. The relevant facts there were as follows:
The defendant, a waterworks company... made a contract with the city of Rensselaer for the supply of water.... Water was to be furnished to the city for sewer flushing and street sprinkling; for service to schools and public buildings; and for service at fire hydrants.... While this contract was in force, a building caught fire. The flames, spreading to the plaintiff's warehouse near by, destroyed it and its contents. The defendant... was promptly notified of the fire, "but omitted and neglected after such notice, to supply or furnish sufficient or adequate quantity of water, with adequate pressure to stay, suppress, or extinguish the fire before it reached the warehouse of the plaintiff, although the pressure and supply which the defendant... had agreed to by said contract to supply and furnish, was adequate and sufficient to prevent the spread of the fire to and the destruction of the plaintiff's warehouse and its contents."
Id. at 896-97. The New York court rejected the plaintiff's common law tort claim: "We are satisfied that liability would be unduly and indeed indefinitely extended by this enlargement of the zone of duty."
We find Moch inapplicable to the present cases. At the time Moch was decided, i.e., three-quarters of a century ago, the body of law governing the undertaker's doctrine was nascent and still ill-defined. The New York Court of Appeals, at that time, did not have the benefit of the Restatement or any other modern authority or precedent on this subject and did not address either "increased risk" or "reliance," both of which are key factors limiting liability in the present cases. Instead, the court sought to limit liability by relying onand adopting the analysis ofa turn-of-the-century *1189 fire hydrant "installation" case,[9] notwithstanding the fact that Moch itself was a "maintenance" case.

D
Clay Electric cites numerous streetlight "maintenance" cases from throughout the nation and claims that the weight of those cases compels a decision in its favor here. We disagree. First, nearly all the cited cases are lower appellate court decisions, not state high court decisions.[10] Second, many of the cited cases are dated, and the courts therein did not address either "increased risk" or "reliance." Third, in those cases that did address "increased risk" and "reliance," the courts' analyses missed the mark andlike Clay Electric's argument in the present caseswere more appropriate for "installation" cases. And finally, many of the cases from other states denied relief based on the appellate courts' own reckoning that a contrary ruling would result in exorbitant rate hikes for consumers. In Florida, such rate-setting projections are best left to the legislative branch, as explained below.

E
Clay Electric claims that an adverse ruling in the present cases will violate public policy in the following way: (a) the ruling will open the floodgates to similar lawsuits against electric companies and other utilities; (b) utilities' maintenance costs will increase sharply;[11] (c) utilities' liability insurance premiums also will increase sharply;[12] (d) utilities will be forced to increase their consumer rates for electricity, water, and other basic services; (e) the adverse impact of those rate hikes on consumers will far outweigh any benefit of allowing the present plaintiffs to proceed with their claims; and finally, (f) such losses already are adequately covered by automobile insurance.
Although courts, where appropriate, will address existent public policy concerns, Clay Electric's "floodgate" argument asks this Court to base its decision on pure speculation. The electric company cites no record evidence supporting its hypothesis. To permit meaningful review, this claim in fact would require a projection of future rate hikes based on established rate-setting formulae governing the utility and insurance industries.[13] No such assessment has been made here and, under Florida's statutory scheme, such matters fall squarely within the purview of the *1190 legislative, not judicial, branch.[14] If this Court were to attempt to evaluate Clay Electric's "floodgate" hypothesis solely on the basis of the present record, we would be usurping the legislative prerogative and our efforts would amount to little more than a judicial "shot in the dark."

V
In addressing a similar liability issue in a fire hydrant "maintenance" case, the New Jersey Supreme Court rejected the water company's claim that utility companies cannot be held liable to third parties:
[T]he primary purpose of tort law is "that wronged persons should be compensated for their injuries and that those responsible for the wrong should bear the cost of their tortious conduct." Moreover, forcing tortfeasors to pay for the harm they have wrought provides a proper incentive for reasonable conduct. A rule that denies water consumers a right of recovery for water-company negligence diminishes the incentive for water companies to perform maintenance that would prevent large ... losses. Since the applicable standard of liability is negligence, and not liability without fault, a water company that exercises due care will not be liable in tort. By acting non-negligently, water companies will decrease the risk of [property] damage and loss of life in ways property owners cannot, and, at the same time, minimize their own exposure to tort liability.
. . . .
It is argued that a rule imposing liability on water companies for negligently failing to provide adequate water pressure to fire hydrants would expose water companies to extraordinary losses at great cost to the public that ultimately pays the water rates established by law. The fear of limitless liability and litigation has marked many advances in tort law. As we said in [a prior case], "[t]he answer to the allegation of unchecked liability is not the judicial obstruction of a fairly grounded claim for redress. Rather, it must be a more sedulous application of traditional concepts of duty and proximate causation to the facts of each case." Reasonable care is not a standard beyond the reach of any enterprise.
Weinberg v. Dinger, 106 N.J. 469, 524 A.2d 366, 375-79 (1987) (footnote and citations omitted) (quoting People Express Airlines, Inc. v. Consolidated Rail Corp., 100 N.J. 246, 495 A.2d 107, 111 (1985)). We agree with this analysis, for it reflects our own precedent spanning the century.[15]
*1191 The answer to the issue posed in the present cases lies not in the judicial obstruction of the plaintiffs' claims, but in the sedulous, even-handed application of established principles of tort law. Reasonable care is not a standard that is beyond Clay Electric's reach. We approve the decisions of the district court in Johnson v. Lance, Inc., 790 So.2d 1144 (Fla. 1st DCA 2001), and Lance, Inc. v. Johnson, 790 So.2d 1163 (Fla. 1st DCA 2001), as explained herein. We express no opinion as to the merits of the underlying negligence claims.
It is so ordered.
ANSTEAD, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
PARIENTE, J., concurs specially with an opinion, in which ANSTEAD, C.J., and LEWIS, J., concur.
CANTERO, J., dissents with an opinion, in which WELLS, J., concurs.
PARIENTE, J., specially concurring.
I concur with the majority and write to address the dissent's contentions regarding the alleged far-reaching effect of our decision in this case. Clay Electric's duty in this case does not arise from its status as a public utility. Neither does its duty spring from its ownership of the lights. Rather, in addition to its assumption of a duty to maintain, Clay Electric's duty arises from a contractual obligation to maintain lights that had been installed by the Jacksonville Electric Authority (JEA). However, once obligated to maintain the lights, any liability for the failure to do so is measured by the benchmark of reasonable care under the circumstances.
The facts that the trial court found to be supported by evidence in the record included that "the contract was in force and Clay Electric had been paid for its maintenance at the time of the accident." Thus, Clay Electric's obligation to maintain the streetlights arose from a decision of its own choosing, for which it received financial remuneration.
The issue in this case involves a classic duty to maintain. In this regard, I agree with the well-reasoned analysis of the First District:
This is a crucial distinction because a governmental entity in Florida owes a legal duty to the motoring public to maintain the traffic lights and stop signs that it undertakes to provide. And this principle logically extends to the present case. If a governmental entity has a duty to maintain traffic lights and stop signs it has erected for the safety of motorists, it also has a duty to maintain other improvements it has erected for the safety of other members of the public.
... [T]he lights installed by the governmental entity were "streetlights." Pursuant to a common-sense understanding of that term, the lights were provided, at least in part, for the ... safety of pedestrians walking along the roadway. The governmental entity therefore had a duty to exercise reasonable care in the maintenance of the streetlights for the protection of such pedestrians. Clay Electric's subsequent undertaking in accordance with its contract to maintain the streetlights therefore gave rise to Clay Electric's duty to these pedestrians to exercise reasonable care in this undertaking.
Johnson v. Lance, Inc., 790 So.2d 1144, 1146 (Fla. 1st DCA 2001) (citations omitted). While a private entity may be negligent for not properly lighting an area as well as not properly maintaining its lights, the First District correctly recognized a distinction between the initial obligation of a governmental entity to install lights and, *1192 once installed, the imposition of a duty to maintain.[16]
Because Clay Electric agreed to maintain the streetlights adjacent to the roadway, a failure to use reasonable care in the exercise of its contractual duty would create a foreseeable zone of risk both to the motoring public and to the pedestrian public. It is well settled in Florida that
[f]oreseeability clearly is crucial in defining the scope of the general duty placed on every person to avoid negligent acts or omissions. Florida, like other jurisdictions, recognizes that a legal duty will arise whenever a human endeavor creates a generalized and foreseeable risk of harming others. As we have stated:
Where a defendant's conduct creates a foreseeable zone of risk, the law generally will recognize a duty placed upon defendant either to lessen the risk or see that sufficient precautions are taken to protect others from the harm that the risk poses.

McCain v. Florida Power Corp., 593 So.2d 500, 503 (Fla.1992) (quoting Kaisner v. Kolb, 543 So.2d 732, 735 (Fla.1989)) (footnote omitted).
The scope of the duty imposed on Clay Electric as the entity responsible for maintaining the City of Jacksonville's streetlights is based on negligence principles and not on absolute liability as an insurer. Thus, the dissent is incorrect that under this decision, a utility "must guarantee illumination of all the streets in the entire area they serve." Dissenting op. at 1204 (emphasis added)
The principle that the obligation to exercise reasonable care in the performance of a contractual duty extends to third parties who may be foreseeably injured and not just to those in privity of contract is a bedrock principle of modern tort jurisprudence. Indeed, contrary to the dissent's assertion, this Court's early twentieth century jurisprudence regarding utilities also supports a finding of duty in this case. In both Mugge v. Tampa Waterworks Co., 52 Fla. 371, 42 So. 81 (1906), and Woodbury v. Tampa Waterworks Co., 57 Fla. 243, 49 So. 556 (1909), the Court concluded that Tampa Waterworks had a duty to individual property owners, by virtue of its contract with the city, to use reasonable care in furnishing water for fire protection. See Mugge, 42 So. at 86; Woodbury, 49 So. at 559. In reaching this conclusion in Mugge, the Court did not rely on the specific contractual language cited by the dissent,[17] but rather on the fact that under the contract, which gave the water company "extensive franchises and privileges," the water company had "assumed the public duty of furnishing water for extinguishing fires." Mugge, 42 So. at 86; see also Woodbury, 49 So. at 559 ("The right of the *1193 plaintiff to maintain an action for damages of this character was determined adversely to the waterworks company in ... Mugge."). This interpretation is supported by the fact that the Court expressly approved the view taken in Guardian Trust Co. v. Fisher, 200 U.S. 57, 26 S.Ct. 186, 50 L.Ed. 367 (1906), in which the United States Supreme Court explained that once the water company in that case proceeded under its contract to construct and operate its plant, the water company had an obligation to individual citizens to use reasonable care:
[The water company] invites the citizens, and if they avail themselves of its conveniences, and omit making other and personal arrangements for a supply of water, then the company owes a duty to them in the discharge of its public calling, and a neglect by it in the discharge of the obligations imposed by its charter, or by contract with the city, may be regarded as a breach of absolute duty, and recovery may be had for such neglect.
Id. at 68, 26 S.Ct. 186 (quoted in Mugge, 42 So. at 85).
These same principles apply to the facts of this case, which involve the failure to maintain a streetlight that was inoperable for a period of time. The trial court found that there was evidentiary support for the allegations of negligence in that the "light nearest the accident was not illuminated" and that Clay Electric "never instituted a system to regularly inspect the bulbs at night to determine when lights needed replacement bulbs or repairs."[18] Whether Clay Electric exercised reasonable care under the circumstances would be for the jury to determine, as would the question of whether its failure to maintain the streetlight was a legal cause of the accident and the resulting death of the minor plaintiff.
In the proceedings below, Clay Electric did not raise causation as a basis for summary judgment and the First District did not address it. The trial court entered an order in which it observed that there was evidentiary support for the fact that "if the lights had been properly maintained, [the driver] would have seen the decedent in time to avoid the collision." At trial, causation would be a jury question with the plaintiff bearing the burden of proof that the nonfunctioning overhead light was a legal cause of the accident.
As for the dissent's cost-benefit analysis, there is no record support for the dissent's statement that the "cost of compelling a utility to ensure that all streetlights it maintains are continually in working order outweighs any potential reduction of risk." Dissenting op. at 1204. First, the duty imposed is one of reasonable care and not of continually ensuring that all lights are in working order, which would result in the imposition of absolute liability. Second, in determining the potential reduction of the risk, the evaluation of the injuries or deaths resulting from the failure to maintain must be factored into the equation.
Further, the economic cost-benefit approach to determining the existence of a duty is not one this Court has embraced in deciding whether to impose a duty on an entity who negligently injures a foreseeable third party.[19] The dissent's economics *1194 approach would be a departure from principles we have applied in our precedent. Moreover, by our opinion in this case we are not expanding principles of common law tort liability but merely applying traditional principles of negligence to the specific facts in the record before us.
As for the role of economics, if a defendant such as Clay Electric wants to argue at trial that it made a decision not to perform maintenance based on economic reasons, that is a factor that a jury may take into account in determining whether Clay Electric's behavior was reasonable under all the circumstances, just as the jury may take into account the cost of the ensuing injuries and deaths that may have resulted from the defendant's decision. Clay Electric could certainly argue at trial that it did in fact exercise reasonable care in the way it maintained the streetlights and explain what steps it undertook to inspect the lights periodically in order to determine whether lights needed replacement. Clay Electric could explain why this particular light had not been replaced despite the fact that it apparently was not functioning for a significant period of time. Perhaps Clay Electric relied on a system of actual notification before it would replace a nonfunctioning streetlight; perhaps it utilized bulbs that rarely needed replacement. However, all of these facts are undeveloped in the present record.
There is also no support in the record for the dissent's statement that "the ratepayers... will bear the brunt through higher rate structures." Dissenting op. at 1204. The duty imposed on Clay Electric does not arise from its status as a utility, but rather from its role as the entity charged with maintaining the streetlights in proper working order. In addition, we do not know whether Clay Electric possesses liability insurance, whether there is an agreement with the City to indemnify or hold Clay Electric harmless, or to what extent Clay Electric benefited as a result of being compensated for its obligation to maintain the lights. All these factors are outside the scope of our consideration in determining whether a duty of care exists under our case law. Moreover, it is pure speculation that allowing this type of claim to be made will adversely affect utility rate payers. If we were to engage in speculation, we could also speculate that allowing this claim would result in lower automobile insurance premiums by spreading the risk to other potential tortfeasors.
As to the dissent's public policy argument that the risk of loss from automobile accidents is best borne by automobile liability insurance, see dissenting op. at 1203, that also is not a proper legal consideration in determining whether a duty exists in this case. In fact, we rejected a similar argument recently in Whitt v. Silverman, 788 So.2d 210 (Fla.2001). In Whitt, we held that the landowner owed a duty of care to a pedestrian who was injured in an automobile accident as a result of foliage on the premises that impaired the driver's view of the sidewalk, thus causing or contributing to the accident. In dismissing *1195 the defendant's assertion in Whitt that the focus should be on the motorist and not the landowner, we explained:
The landowner here asserts that if this Court recognizes any duty on his part, landowners will in essence be delegated the role of insurers for motorists using their adjoining roadways and that imposing this duty will relieve motorists of their established duty of care. However, as has been noted quite often, the imposition of a duty is nothing more than a threshold requirement that if satisfied, merely opens the "courthouse doors." Once this duty is satisfied, an injured party must still prove the remaining elements of a negligence claim, including the much more specific proximate cause requirement. Hence, the burden remains with a claimant to establish the elements of a negligence claim against a defendant-landowner before being entitled to recover damages. Moreover, the imposition of a duty of care upon landowners will not relieve motorists of a duty because in Florida, even if a landowner breaches her duty of care, a plaintiff's award will be offset by the percentage of fault attributable to him in comparison to the fault of others, including the landowner.
Id. at 221 (citations omitted). The same observations we made in Whitt apply in this case.
The questions that will be addressed first by the jury will be whether Clay Electric was negligent in failing to maintain the streetlights and, if so, whether its negligence was a legal cause of the accident. If the jury determines the existence of liability on the part of Clay Electric, the jury may also determine that the motorist was also at fault and attribute a percentage of responsibility to the motorist. The jury would also be charged with determining any comparative negligence on the part of the pedestrian. All that is decided by the majority opinion is that from the factual allegations in this case, a duty arose on the part of Clay Electric to exercise reasonable care. That is not a novel concept but instead an application of well-established principles of negligence.
ANSTEAD, C.J., and LEWIS, J., concur.
CANTERO, J., dissenting.
The issue in this case is whether Clay Electric Cooperative, Inc., having maintained streetlights in the Jacksonville area, owed a duty to the public to replace nonfunctioning lightbulbs. In concluding that Clay Electric owed such a duty, the majority relies not on any contractual obligation to maintain the streetlights, but on the "undertaker's doctrine" found in section 324A of the Restatement (Second) of Torts (1965).[20] The majority misapplies that doctrine, and in doing so places Florida in the decided minority of states that have considered this issue.

I. Union Park

The majority relies on our decision in Union Park Memorial Chapel v. Hutt, 670 So.2d 64 (Fla.1996), which applied the undertaker's doctrine. Majority op. at 1186. In Union Park, we held that "a funeral director who voluntarily undertakes to organize and lead a funeral procession owes a duty of reasonable care to procession participants." Id. at 65. We found that duty in section 324A of the Restatement, on which the majority today also relies. *1196 Simply stated, the Restatement provides that one who "undertakes" to act, even when under no obligation to do so, must act with reasonable care. Id. at 66-67. In Union Park, the funeral director had organized a funeral procession. The plaintiff was injured when, as part of that procession, she drove through a red light. Id. at 65. We explained that in joining a funeral procession, participants are likely to rely to some degree on the director for their safety. Id. at 67. In other words, because the funeral director had organized a funeral procession, participants felt free to drive through red lights, confident in their continued safety. Absent a funeral procession, the participants would have stopped at red lights, as the law required. Therefore, the procession placed them in a more precarious position than they otherwise would have found themselves in, and the funeral director had a duty to exercise reasonable care for their safety.
Union Park relied on McCain v. Florida Power Corp., 593 So.2d 500, 503 (Fla. 1992), which held that "[w]here a defendant's conduct creates a foreseeable zone of risk, the law generally will recognize a duty placed upon defendant either to lessen the risk or see that sufficient precautions are taken to protect others from the harm that the risk poses." In McCain, the power company's electrical equipment was located underground and known to be dangerous. A power company employee marked an area where a trench could safely be dug. McCain was injured when he used his trencher in an area the company had marked as "safe" but which actually contained power lines. Again, in McCain the power company assumed a specific duty concerning dangerous equipment and breached that duty in marking the area. Had the power company not marked off areas as safe, the plaintiff would not have felt comfortable digging a trench in an area containing power lines, and would have taken appropriate steps to ensure he did not dig over one. As was the case in Union Park, by marking areas as "safe" the defendant placed the plaintiff at greater risk than had the utility not acted at all.
Both Union Park and McCain stand for the proposition that a person who undertakes an act to protect others from danger may be liable if the actions place others at greater risk than they would have experienced in the absence of the conduct. This is not such a case. Here, the sole basis for imposing a duty on Clay Electric is that it maintained the streetlights in question. That conduct, however, did not place pedestrians at greater risk than if Clay Electric never had provided streetlights at all.[21] Nor did Clay Electric's alleged failure to maintain the streetlights create a dangerous condition, as did the defendant's actions in McCain and Union Park. The natural state of nighttime is darkness. That is why cars have headlights. Pedestrians walking at night encountered darkness before Clay Electric provided the streetlights, and continue to encounter darkness where streetlights do not exist.

II. Decisions in Other States
The majority places Florida in the overwhelming minority among states that have considered this issue. As one court has recognized, "[c]ases in other jurisdictions almost uniformly hold that utilities are not liable to third persons for injuries caused by nonfunctioning streetlights." Vaughan v. E. Edison Co., 48 Mass.App.Ct. 225, 719 N.E.2d 520, 522 (1999). These states follow Justice Cardozo's opinion in H.R. Moch Co. v. Rensselaer Water Co., 247 N.Y. 160, 159 N.E. 896 (1928), and view *1197 streetlights as a mere benefit, the deprivation of which does not result in liability. Because H.R. Moch is the seminal case on the continuing duty to provide a benefit to the public, I believe it sheds some light on the issue here.
In H.R. Moch, a water company breached its contract with the city to furnish water to the city's fire hydrants. The plaintiff's building caught fire, and because of insufficient water pressure, the fire could not be extinguished. The plaintiff sued, alleging that the water company breached a common law duty. Justice Cardozo, writing for the court, reasoned:
In a broad sense it is true that every city contract not improvident or wasteful, is for the benefit of the public. More than this, however, must be shown to give a right of action to a member of the public not formally a party. The benefit, as it is sometimes said, must be one that is not merely incidental and secondary. It must be primary and immediate in such a sense and to such a degree as to bespeak the assumption of a duty to make reparation directly to the individual members of the public if the benefit is lost.
159 N.E. at 897 (citation omitted). The court distinguished between conduct of a utility that would impose a duty to the public at large and conduct that would not:

If conduct has gone forward to such a stage that inaction would commonly result, not negatively merely in withholding a benefit, but positively or actively in working an injury, there exists a relation out of which arises a duty to go forward.... The query always is whether the putative wrongdoer has advanced to such a point as to have launched a force or instrument of harm, or has stopped where inaction is at most a refusal to become an instrument for good.
159 N.E. at 898 (citations omitted) (emphasis added). The court noted that the indefinite number of potential beneficiaries "would be unduly and indeed indefinitely extended by ... enlargement of the zone of duty." Id. at 899.
Many other jurisdictions also have refused to impose a duty to maintain existing streetlights. See Turbe v. Gov't of the Virgin Islands, 938 F.2d 427 (3d Cir.1991) (finding no duty where the plaintiff was assaulted near a nonfunctioning streetlight); Sinclair v. Dunagan, 905 F.Supp. 208 (D.N.J.1995) (applying New Jersey law and finding no duty where a pedestrian was struck by a car while crossing an intersection); White v. S. Cal. Edison Co., 25 Cal.App.4th 442, 30 Cal.Rptr.2d 431 (1994) (finding no duty where the plaintiff was driving a moped and was hit by a car at an intersection where the streetlights were not functioning, noting that the failure to maintain a streetlight does not create a risk greater than the risk created by the total absence of a streetlight); Quinn v. Ga. Power Co., 51 Ga.App. 291, 180 S.E. 246, 248 (1935) (finding no duty, despite a contract between the utility and the city, where two vehicles collided in an area where the streetlights were not functioning); Shafouk Nor El Din Hamza v. Bourgeois, 493 So.2d 112, 117 (La.Ct.App. 1986) (finding no duty where a pedestrian was hit by a car near an inoperative streetlight, even though the utility had contracted with the municipality to install and maintain streetlights); Vaughan, 719 N.E.2d at 522 (finding no duty where a pedestrian was hit by a car at an intersection on which stood an inoperative streetlight); E. Coast Freight Lines v. Consol. Gas, Elec. Light & Power Co., 187 Md. 385, 50 A.2d 246 (1946) (finding no duty, despite a contract between the utility and the city, where two vehicles collided at an intersection where the streetlights were *1198 not functioning); Thompson v. City of New York, 78 N.Y.2d 682, 578 N.Y.S.2d 507, 585 N.E.2d 819, 820 (1991) (finding no duty where a pedestrian was struck by an automobile near a nonfunctioning streetlight because the street was not unusually dangerous in the absence of the streetlight); Gin v. Yachanin, 75 Ohio App.3d 802, 600 N.E.2d 836 (1991) (finding no duty where a pedestrian was injured as a result of a de-energized traffic signal, even though the utility company may have breached its contract with the municipality to supply power to the signal); Fishbaugh v. Utah Power & Light Co., 969 P.2d 403 (Utah 1998) (finding no duty where a pedestrian was struck by an automobile near a non-functioning streetlight because the street was not unusually dangerous in the absence of the streetlight); Dattner v. Lamm, 5 Pa. D. & C.2d 552, 1956 WL 6509 (Pa.Com.P1.1956) (finding no duty where a pedestrian was struck by an automobile near a non-functioning streetlight); White v. Tilcon Gammino, Inc., No. KC88-0618, 1992 WL 813636 (R.I.Super.Ct. July 28, 1992) (finding no duty was owed to the driver of an automobile because she was not an intended beneficiary of the contract between the utility company and the municipality).
Despite the overwhelming number of jurisdictions that have refused to impose a duty to maintain existing streetlights, the majority simply distinguishes these cases because they rely on H.R. Moch. The majority also distinguishes between cases alleging negligent installation of streetlights and those alleging negligent maintenance of installed lights. Neither distinction makes a difference.
The majority states that "[a]t the time Moch was decided ... the body of law governing the undertaker's doctrine was nascent and still ill-defined." Majority op. at 1188. Moreover, it states that the "New York Court of Appeals, at that time, did not have the benefit of the Restatement or any other modern authority or precedent on this subject and did not address either `increased risk' or `reliance.'" Majority op. at 1188. To the contrary, section 323 of the first Restatement of Torts addressed the increased risk element of the undertaker's doctrine. See Restatement of Torts § 323 cmts. c-d (1934). Moreover, section 325 of the first Restatement of Torts specifically addressed "reliance" and liability to third parties. See Restatement of Torts § 325 cmt. a, illus. 1 (1934). Many of the cases that rely on H.R. Moch cite to the Restatement and conclude, as I do, that it does not apply. See, e.g., Turbe, 938 F.2d at 432 (relying on H.R. Moch and concluding that sections 323(a) and 324A(a) of the Restatement (Second) of Torts only applies when the defendant's actions increase the risk of harm beyond the risk that would have existed had the defendant never provided services initially); Vaughan, 719 N.E.2d at 525 (same).
As other states almost universally hold, the maintenance of streetlights is a benefit. Withholding it does not "launch[ ] a force or instrument of harm." H.R. Moch, 159 N.E. at 898. It is at most "a refusal to become an instrument for good." Id. The withholding of a benefit breaches no duty.

III. The Restatement of Torts
The majority relies for its conclusion on several sections of the Restatement of Torts. However, it incorrectly interprets these sections. I will discuss each in turn.

A. Interpretation of Section 324A(a)
The majority misinterprets section 324A(a) of the Restatement (Second) of Torts (1965). Majority op. at 1187-88. Section 324A states:
One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary *1199 for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if
(a) his failure to exercise reasonable care increases the risk of such harm....
The question under subsection (a) is whether Clay Electric's failure to exercise reasonable care in maintaining the streetlights increased the risk of harm beyond the risk that existed before Clay Electric's alleged agreement to maintain the streetlights. The answer is obviously "no," because the failure to maintain an installed streetlight does not create a greater risk than that created by the absence of a streetlight. It simply reverts the circumstances to the status quo antedarkness.
Other courts have interpreted section 324A(a) consistent with this analysis. They hold that, for liability to attach, the defendant's conduct must have increased the risk beyond that existing before the defendant undertook the conduct. See, e.g., Turbe, 938 F.2d at 432 (concluding that sections 323(a) and 324A(a) of the Restatement (Second) of Torts only apply when the defendant's actions increase the risk of harm beyond the risk that would have existed had the defendant never provided services initially); Vaughan, 719 N.E.2d at 525 (same).
The majority stands alone in its new interpretation of section 324A(a). It implicitly concludes that liability attaches if the defendant's conduct left the plaintiff in a worse position than the plaintiff was in when the services were begun. Majority op. at 1187. Under the majority's analysis, the relative risk to the plaintiff is measured when the streetlights were already installed, and were simply being maintained. Therefore, under the majority's view, because walking across a dark street at night is riskier than walking across a lighted one, once Clay Electric began maintaining the streetlights it incurred a duty to maintain them forever. The majority cites no case interpreting section 324A(a) in such a fashion, and I can find none. To the contrary, many of the cases refusing to find a duty did so where the allegation was negligent maintenance. See Vaughan, 719 N.E.2d at 523 (holding that "ordinarily an electric company under contract to make repairs and maintain street lights has no common law duty to third persons who are injured"); White, 30 Cal.Rptr.2d at 437 (noting that "the failure to maintain an installed streetlight does not create a risk greater than the risk created by the total absence of a streetlight"); Fishbaugh, 969 P.2d at 406 (holding that "[b]ecause a municipality has no common law duty to light its streets, it has no duty to maintain such lights that it has nevertheless elected to install"). In fact, virtually every case involves streetlights that allegedly were inadequately maintained, because allegations of negligent installation are extremely rare. The majority's opinion is the first and only case creating a distinction between the installation of streetlights (for which no duty exists) and their maintenance (for which a duty does exist). Florida stands alone among the fifty states in such a jurisprudence. The majority's holding has far-reaching consequences that not even the majority has contemplated. It essentially imposes a duty on those who provide a benefit to the public or to an individual to continue doing so forever.[22] Nothing in *1200 our lawor any states' lawsuggests imposing such a heavy burden.

B. Interpretation of Section 324A(c)
The majority also misinterprets section 324A(c) of the Restatement (Second) of Torts. Under that section, one who renders services to another which he should recognize as necessary for the protection of a third person or his things is subject to liability if "the harm is suffered because of reliance of the other or the third person upon the undertaking." Restatement (Second) of Torts § 324A(c). Thus, if a third party relies on Clay Electric's maintenance of streetlights, then Clay Electric owed a duty to maintain them. Using this principle, the majority assumes that "Clay Electric, in undertaking to maintain the streetlights in Dante's neighborhood, arguably caused Delores Johnson to rely on the fact that the lights would be operating properly and that Dante's pathway to the school bus stop would be lighted." Majority op. at 1187. Nowhere in the record, however, does Ms. Johnson allege that she relied on the streetlights. The complaint merely alleges that the nonfunctionality of the streetlights was "known to Clay Electric or existed for a sufficient length of time so that Clay Electric should have known of it." Moreover, a neighbor of Ms. Johnson testified that the two streetlights closest to the accident site "never worked" and had been out for "years." Another neighbor testified that the light to the west of the accident site had been out the entire time he lived in the area (over seven years) and the light to the east of the accident site only worked intermittently.[23] This testimony was undisputed. Because the plaintiff did not even allege reliance, let alone submit evidence of it, no inference can reasonably be drawn from the record that anyone relied on a functioning streetlight.
In sum, the Restatement simply does not support the majority's holding. Although a minority of courts across the country have imposed a duty to maintain streetlights, none have relied on the Restatement.

IV. Clay Electric's Contract with the JEA
The concurrence argues that Clay Electric's duty "arises from a contractual obligation to maintain lights that had been installed by the Jacksonville Electric Authority (JEA)." Concurring op. at 1191. *1201 Although a streetlight maintenance contract may impose a contractual duty to the municipality, it does not automatically impose a duty to the public. Some of the courts that have declined to recognize a common law duty have done so even in the face of such a contract. See, e.g., Shafouk Nor El Din Hamza v. Bourgeois, 493 So.2d 112, 117 (La.Ct.App.1986); E. Coast Freight Lines, 50 A.2d at 254-55; Quinn v. Ga. Power Co., 51 Ga.App. 291, 180 S.E. 246, 248 (1935). While a duty may arise from a contract even where none exists at common law or pursuant to statute, we have held that in such cases the contract itself defines the extent of the duty. See Mugge v. Tampa Waterworks Co., 52 Fla. 371, 42 So. 81, 86 (1906).
As has been the law of this state for nearly a hundred years, for a utility to assume a duty to the public arising from a contract with a municipality, the contract must specifically establish an intent to compensate the public in the event of a default. Mugge, 42 So. at 86. Whether a utility assumes a duty to the public when it contracts with a municipality to provide streetlights will depend on the contract's terms.
This analysis is consistent with both Mugge and our subsequent decision in Woodbury v. Tampa Waterworks Co., 57 Fla. 243, 49 So. 556 (1909). In both cases, individuals who suffered fire damage sued the Tampa Waterworks Company alleging it negligently failed to furnish water for fire protection, in breach of its contract with the city. In Mugge, the plaintiff alleged that the contract between Tampa Waterworks and the City of Tampa provided "that the waterworks company should assume all liabilities to persons and property arising from [the] constructi[on] or operati[on] of the [waterworks system]; [and] that said contract was made and acquiesced in by the defendant company for the benefit of citizens and property owners of the city, including the plaintiff." 42 So. at 81. In concluding that the complaint sufficiently alleged a cause of action, this Court held "the contract of the water company is the measure of its duty to the property owner, and therefore of its liability." Id. at 86. Tampa Waterworks had "assumed the public duty of furnishing water for extinguishing fires, according to the terms of its contract." Id. In Woodbury, the plaintiff alleged that Tampa Waterworks Company breached its contractual duty with the City of Tampa to supply water to the fire hydrants in the immediate area where a fire began, thus causing the fire to spread to plaintiff's property. This Court held that "[t]he duty ... owed to the plaintiff by virtue of the public service engaged in by the defendant was to supply the hydrants near the plaintiff's property with water as legally required.... The plaintiff has no right of action for a failure to furnish water where the plaintiff's property was not located, if such failure was not a proximate cause of the burning of the plaintiff's property." Woodbury, 49 So. at 559.
We have since reaffirmed both Mugge and Woodbury. In Arenado v. Florida Power & Light Co., 541 So.2d 612 (Fla. 1989), we dismissed review because the lower court's decision did not conflict with those cases. The Court stated: "We now agree that Mugge and Woodbury were predicated upon special language in the Tampa Waterworks' contracts which does not exist here. `[T]he contract of the water company is the measure of its duty to the property owner.'" Id. at 614 (quoting Mugge, 42 So. at 86). Thus, our unanimous decision in Arenado acknowledges that the contracts in Mugge and Woodbury were the defining source of the duty. The concurring opinion's contrary interpretation of these cases contradicts Arenado. Concurring op. at 1192-93.
*1202 The district court's decision in Arenado (with thenJudge Anstead on the panel) affirmed the dismissal of a complaint on even more distressing facts. In Arenado, a collision occurred at an intersection because a downed power line had cut off electricity to the traffic signal. The decedent's family sued Florida Power and Light (FPL), alleging a duty based on FPL's contract with the City. In rejecting that argument, the court relied on H.R. Moch Co. as well as on Mugge and Woodbury. As to H.R. Moch, it quoted Cardozo's discussion of a duty based on contract:
In a broad sense it is true that every city contract not improvident or wasteful, is for the benefit of the public. More than this, however, must be shown to give a right of action to a member of the public not formally a party. The benefit, as it is sometimes said, must be one that is not merely incidental and secondary.... It must be primary and immediate in such a sense and to such a degree as to bespeak the assumption of a duty to make reparation directly to the individual members of the public if the benefit is lost.
Arenado, 523 So.2d at 628-29 (quoting H.R. Moch Co., 159 N.E. at 897). The court then addressed the plaintiff's argument that this Court's decisions in Mugge and Woodbury placed Florida in the minority of states that would impose liability on a utility. The court noted that "[t]he contract in Mugge stated that the waterworks company should assume all liabilities to persons arising from constructing or operating the water system." Id. at 629. As already noted, this Court dismissed review, on the specific ground that the decision did not conflict with either Mugge or Woodbury.
Applying Mugge and Woodbury, as interpreted in Arenado, to the facts in this case, the trial court properly granted summary judgment in favor of Clay Electric because "there is no contract in the record or any other evidence indicating the terms of the contract, including the rights and obligations of the parties." Johnson v. Lance, Inc., 790 So.2d 1144, 1148 (Fla. 1st DCA 2001) (Polston, J., concurring). The plaintiff has not alleged that Clay Electric's contract imposed any duty to the public or expressed an agreement to compensate the public in the event of a default. Without knowing the contract's terms, it is impossible to measure the duty, if any, that Clay Electric owes to the plaintiff. Mugge, 42 So. at 86. Therefore, the trial court did not err when it granted Clay Electric's motion for summary judgment.

V. Public Policy Considerations
The majority dismisses the public policy implications of its decision by stating that such considerations are for the Legislature. Majority op. at 1189-90. Yet this Court has recognized that whether to impose a duty in tort is quintessentially a policy decision. Just last year, this Court quoted William L. Prosser, Handbook of the Law of Torts, § 53, at 325-26 (4th ed.1971), acknowledging that the concept of duty "is not sacrosanct in itself, but only an expression of the sum total of those considerations of policy which lead the law to say that the particular plaintiff is entitled to protection [or not]." Gracey v. Eaker, 837 So.2d 348, 354 (Fla.2002) (quoting Rupp v. Bryant, 417 So.2d 658, 667 (Fla.1982)) (emphasis added). The Court now ignores the reality that, in developing the common law of this State, this Court necessarily considers the public policy implications. See, e.g., Tanner v. Hartog, 696 So.2d 705, 708 (Fla.1997) (concluding, as "a natural evolution of the common law," that "public policy dictates that an action by the parents for negligent stillbirth should be recognized in Florida"); Waite v. Waite, 618 So.2d 1360, 1361 *1203 (Fla.1993) (noting that this Court will not alter the common law "unless demanded by public necessity or to vindicate fundamental rights"); In re T.A.C.P., 609 So.2d 588, 594 (Fla.1992) (considering "whether there is good reason in public policy for this Court to create an additional common law standard applicable to anencephalics"); Byrd v. Richardson-Greenshields Sec., Inc., 552 So.2d 1099, 1104 (Fla.1989) (holding that "[p]ublic policy now requires that employers be held accountable in tort for the sexually harassing environments they permit to exist, whether the tort claim is based on a remedial statute or on the common law"); Kilpatrick v. Sklar, 548 So.2d 215, 217 (Fla.1989) (noting that "strong public policy considerations" supported application of the common law "fireman's rule"); Florida Power & Light Co. v. Westinghouse Elec. Corp., 510 So.2d 899, 900-01 (Fla.1987) (noting that a majority of jurisdictions have adopted the economic loss doctrine based on a judicial policy determination that contract principles are more appropriate than tort principles for resolving economic loss claims unaccompanied by physical injury or property damage). Obviously, public policy not only plays a role, but a crucial one, in determining whether to impose a common law duty. The majority's refusal to acknowledge this fact is inexplicable.
Those policy considerations militate against imposing a duty on utility companies in these circumstances. As the California court said on this issue,
[t]he issue of duty is a policy consideration. We must take into consideration not only the foreseeability of harm to a plaintiff but also the burdens to be imposed against a defendant. In determining whether a public utility should be liable ... for inoperable streetlights, we must consider the cost of imposing this liability on public utilities, the current public utility rate structures, the large number of streetlights, the likelihood that streetlights will become periodically inoperable, the fact that motor vehicles operate at night with headlights, the slight chance that a single inoperative streetlight will be the cause of a motor vehicle collision, and the availability of automobile insurance to pay for damages.
White, 30 Cal.Rptr.2d at 437. By blinding itself to the public policy implications, the majority abdicates its duty to consider such implications in developing the common law.
The Legislature has determined that the risk of loss from automobile accidents is best borne by automobile liability insurance. To that end, every automobile owner is required to carry automobile liability coverage or otherwise comply with the financial responsibility law. See § 324.022, Fla. Stat. (2002). Pedestrians and drivers can further protect themselves by purchasing uninsured motorist coverage. I would therefore adopt the following reasoning in White:
We are of the opinion that a public utility generally owes no duty to the motoring public for inoperable streetlights. There is no contractual relation between the utility and the injured party, and the injured party is not a third party beneficiary of the utility's contract with the public entity. The public utility owes no general duty to the public to provide streetlights. The burden on the public utility in terms of costs and disruption of existing rate schedules far exceeds the slight benefit to the motoring public from the imposition of liability. As noted, vehicles at night are driven with headlights, it is unlikely that a single inoperable streetlight will be a substantial factor in causing a collision *1204 and automobile insurance is available to cover damages.
30 Cal.Rptr.2d at 437. See also Vaughan, 719 N.E.2d at 524 (noting that "the imposition of tort liability on those who must render continuous service of this kind to all who apply for it under all kinds of circumstances could ... be ruinous and the expense of litigation and settling claims over the issue of whether or not there was negligence could be a greater burden to the rate payer than can be socially justified").
The cost of compelling a utility to ensure that all the streetlights it maintains are continually in working order outweighs any potential reduction of risk. Under the majority's analysis, utilities such as Clay Electric must guarantee illumination of all the streets in the entire area they serve. The majority presumably believes that utilities will shoulder this burden alone, but it is the ratepayers who will bear the brunt through higher rate structures. This is an unfortunate and unnecessary result, given that automobile liability insurance is capable of providing the required protectionindeed, it has done so until now.[24]
The majority's conclusion also raises more questions than it answers. Does a *1205 utilityor a municipalityhave a duty to place streetlights where none exist? Can a utility be negligent in its arrangement of the streetlights, by leaving some areas dark? Can a utility be negligent in the amount of light provided? Must a utility immediately replace bulbs that go out or be subject to liability? Does a utility now have a duty to patrol an entire municipality to ensure that its lights work properly? Does the duty to maintain lights forever extend to a property owner whose porch lamp illuminates an adjacent roadway?
I fear that the majority has imposed a load too heavy to carry, and one that will grow increasingly burdensome and unpredictable. It will be the ratepayers who will ultimately suffer, once utilities calculate the costs of this new duty.[25] Moreover, the Court's holding will produce an effect opposite of the one intended: our streets will not become safer. Rather, municipalities and utilities will ponder carefully before installing any new streetlights, especially in rural areas (where they are most needed) as it will only increase their potential liability.

V. Conclusion
Because Clay Electric's undertaking did not create a common law duty, and because the plaintiff failed to provide any evidence that Clay Electric's contract intended to compensate the public in the event of a breach of its contractual duty, I would find that the trial court properly granted Clay Electric's motion for summary judgment. Accordingly, I would quash the First District's decisions.
For these reasons, I dissent.
WELLS, J., concurs.
NOTES
[1] See Escobar v. Bill Currie Ford, Inc., 247 So.2d 311 (Fla.1971).
[2] See Major League Baseball v. Morsani, 790 So.2d 1071 (Fla.2001).
[3] See Restatement (Second) of Torts § 323 (1965).
[4] See, e.g., Dept. of Transp. v. Neilson, 419 So.2d 1071 (Fla.1982); Commercial Carrier Corp. v. Indian River County, 371 So.2d 1010 (Fla.1979).
[5] See, e.g., Union Park Mem'l Chapel v. Hutt, 670 So.2d 64 (Fla.1996); McCain v. Fla. Power Corp., 593 So.2d 500 (Fla.1992).
[6] See, e.g., First Fla. Bank v. Max Mitchell & Co., 558 So.2d 9 (Fla.1990); First Am. Title Ins. Co. v. First Title Serv. Co., 457 So.2d 467 (Fla.1984); A.R. Moyer, Inc. v. Graham, 285 So.2d 397 (Fla.1973); Smith Eng'g & Constr. Co. v. Cohn, 94 So.2d 826 (Fla.1957); Mugge v. Tampa Waterworks Co., 52 Fla. 371, 42 So. 81 (1906).
[7] See, e.g., Trianon Park Condo. Ass'n, Inc. v. City of Hialeah, 468 So.2d 912 (Fla.1985); Commercial Carrier Corp. v. Indian River County, 371 So.2d 1010 (Fla.1979).
[8] See Restatement (Second) of Torts § 324A cmt. e (1965).
[9] See German Alliance Ins. Co. v. Home Water Supply Co., 226 U.S. 220, 33 S.Ct. 32, 57 L.Ed. 195 (1912).
[10] In fact, Clay Electric cites only two state high court decisions, and one of those decisions was rendered more than a half-century ago. Both cases involved factual scenarios far different from the present cases. See Fishbaugh v. Utah Power & Light, 969 P.2d 403 (Utah 1998) (involving a malfunctioning photocell that disabled an entire row of twenty-eight streetlights, which malfunction may have occurred just minutes before the accident); East Coast Freight Lines, Inc. v. Consolidated Gas, Electric Light & Power Co., 187 Md. 385, 50 A.2d 246 (1946) (involving a tractor-trailer colliding with both a light pole and another tractor-trailer).
[11] But see Sinclair v. Dunagan, 905 F.Supp. 208, 214 (D.N.J.1995) (finding no liability where an electric company undertook a simple program to "(1) replace bulbs upon notification of their failure, and (2) replace them routinely once every four years").
[12] But cf. Weinberg v. Dinger, 106 N.J. 469, 524 A.2d 366, 376 (1987) ("In states that impose liability on water companies that fail to supply adequate pressure for fire fighting, the claims experience has been insubstantial and water companies have used insurance, self-insurance, and reserve funds to meet their obligations to claimants.").
[13] See infra note 14.
[14] See ch. 350, Fla. Stat. (1997) (declaring that the Florida Public Service Commission is "an arm of the legislative branch of government" and setting forth criteria governing the commission); ch. 366, Fla. Stat. (1997) (declaring that the regulation of public utilities" "shall be deemed to be an exercise of the police power of the state" and setting forth criteria governing such regulation); § 366.02(2), Fla. Stat. (1997) (defining "electric utility" as "any municipal electric utility, investor-owned electric utility, or rural electric cooperative which owns, maintains, or operates an electric generation, transmission, or distribution system within the state"); ch. 425, Fla. Stat. (1997) (setting forth the "Rural Electric Cooperative Law," which establishes criteria governing the formation, operation, and distribution of revenues of such cooperatives); ch. 627, Fla. Stat. (1997) (declaring that a purpose of the Florida Insurance Code is "[t]o promote the public welfare by regulating insurance rates as herein provided"); see also In re Adv. Opinion to the Gov., 223 So.2d 35, 38 (Fla.1969) (recognizing "the inherent power of the Legislature to regulate these types of business enterprises involved in public service").
[15] See Mugge v. Tampa Waterworks Co., 52 Fla. 371, 42 So. 81 (1906); see also Woodbury v. Tampa Waterworks Co., 57 Fla. 243, 49 So. 556 (1909).
[16] Thus, the issues raised by the dissent, see dissenting op. at 1204-05, as to whether there is a duty to place streetlights where none exist or whether the utility can be negligent in the amount of light provided or the arrangement of the streetlights are questions outside the issue in this case and beyond the scope of our review.
[17] The contractual language cited by the dissent is "that the waterworks company should assume all liabilities to persons and property arising from the constructing or operating of the [waterworks system]" and "that said contract was made and acquiesced in by the defendant company for the benefit of citizens and property owners of the city" See dissenting op. at 1201. Notably, this language is mentioned only once, in the facts section of the opinion, see Mugge, 42 So. at 81, and is not relied on by the Court as the basis for imposing a duty on Tampa Waterworks to the public. Moreover, this Court's decision in Arenado v. Florida Power & Light Co., 541 So.2d 612 (Fla.1989), should not be read as anything other than a determination that no conflict existed between Mugge, Woodbury and the district court's decision in Arenado.
[18] Clay Electric has not asserted nor does it appear in the record that there was an express limitation on Clay Electric's duty to maintain the streetlights set forth in its contract with the JEA. Thus, the issue of what effect such a limitation would have on Clay Electric's duty to exercise reasonable care was neither before the trial court, the appellate court nor this Court.
[19] Florida Power & Light v. Westinghouse Electric Corp., 510 So.2d 899 (Fla.1987), on which the dissent relies to support its suggestion that this Court "has previously engaged" in an economic analysis, see dissenting op. at 1204, note 24, does not apply to cases involving personal injuries. Westinghouse Electric involved the issue of whether a buyer under a contract for goods could recover for economics losses where there was no claim for personal injury or property damage. See 510 So.2d at 899. We specifically held that "contract principles [are] more appropriate than tort principles for resolving economic loss without an accompanying physical injury or property damage." Id. at 902 (emphasis supplied). Further, noting that a "purchaser has the choice to forgo warranty protections in order to obtain a lower price," we concluded that "we should refrain from injecting the judiciary into this type of economic decision-making." Id.
[20] The complaint alleges that "Clay Electric contracted with either the City of Jacksonville and/or the Jacksonville Electric Authority [JEA]" to provide street lights near the accident site. In the alternative, the complaint alleges that Clay Electric was responsible for the maintenance of the street lights near the accident site.
[21] Of course, under the facts alleged in the complaint, the City of Jacksonville or the JEA, not Clay Electric, erected the streetlights. Clay Electric merely maintained them.
[22] The majority cites Ahmed v. Burns, No. CA9900004D, 2000 WL 1511756, at *1 (Mass.Super.Ct. Sept. 20, 2000), for the proposition that its holding will not force utilities to continue their services in perpetuum once they undertake to maintain streetlights. The case, however, sheds little light on the matter. In Ahmed, the town instructed the electric company to turn off every other street light. The court held that the decision was a "discretionary act" subject to governmental immunity. Id. at *3. That holding was limited to the governmental defendant and was distinct from the analysis regarding the electric utility's liability. The opinion did not address whether the governmental immunity holding that protected the town's decision from liability also protected the electric utility. See id. at *1 n. 7. In fact, the court confirmed Vaughan, holding that utilities owed no duty of care to the plaintiff. Id. at *2.
[23] In any event, section 324A(c) would apply mostly in situations where the plaintiff relied on a functioning streetlight in deciding to cross a street. If a streetlight goes out before a pedestrian decides to cross, the pedestrian cannot be relying on a functioning streetlight in crossing the street. See Jones v. United States, 703 F.2d 246, 250-51 (7th Cir.1983) (section 324A(c) does not apply if the plaintiff has the ability to observe the dangerous condition); see also Roberson v. J.C. Penney Co., 251 Ill.App.3d 523, 191 Ill.Dec. 119, 623 N.E.2d 364, 366-67 (1993) ("Reliance [under section 324A(c)] is reasonable where (1) there is a deceptive appearance that the expected performance has been rendered, or (2) the defendant represents to the plaintiff that performance has been made, or (3) the plaintiff is prevented from obtaining knowledge or substituting performance. However, to justify reliance, the plaintiff must be unaware of the actual circumstances and not equally capable of determining such facts.").
[24] The concurring opinion criticizes my use of a "cost-benefit approach [in] determining the existence of a duty," Concurring op. at 1193-94. Of course, the court need not adopt such an approach to hold that no duty to maintain streetlights exists. In this opinion, I have explained other bases for such a decisionsuch as the fact that virtually every other state has rejected it. Nevertheless, many courts have found a cost-benefit analysis helpful in determining whether to impose a duty. See, e.g., Temple Cmty. Hosp. v. Superior Court, 20 Cal.4th 464, 84 Cal.Rptr.2d 852, 976 P.2d 223, 233 (1999) (refusing to impose a duty in intentional spoliation cases after weighing the policy considerations and concluding that "the benefits of recognizing a cause of action" are outweighed by the burdens and by "the costs to society of promoting onerous record and evidence retention policies"); Lodge v. Arett Sales Corp., 246 Conn. 563, 717 A.2d 215, 223 (1998) (stating that the benefits of imposing duty and requiring defendants to compensate the plaintiffs are outweighed by the costs associated with that compensation). Contrary to the suggestion in the concurring opinion, this Court has previously engaged in such an analysis. Cf. Florida Power & Light Co. v. Westinghouse Elec. Corp., 510 So.2d 899, 902 (Fla.1987) (noting that the judiciary should not "intrude into the parties' allocation of risk by imposing a tort duty and corresponding cost burden on the public" and holding that contract principles are more appropriate than tort in resolving economic loss without an accompanying physical injury or property damage) (emphasis added). As the concurring opinion notes, concurring op. at 1193-94, note 19, the Court did state that it should "refrain from injecting the judiciary" into "economic decision making," but this language did not refer to a tort cost-benefit analysis. It referred to contractual bargaining and a party's ability to obtain insurance and warranty protection. Id.

Moreover, cost-benefit analyses are no strangers to tort law. See, e.g., United States v. Carroll Towing Co., 159 F.2d 169, 173 (2d Cir.1947) (Hand, J.) (establishing well-known "Hand Formula" for negligence liability whereby liability depends on whether the burden of taking adequate precautions ("B") is less than the gravity of the injury ("L") multiplied by the probability that the injury-causing act will occur ("P")). "It thus is fundamental that the standard of conduct which is the basis of the law of negligence is usually determined upon a risk-benefit analysis: by balancing the risk, in light of the social value of the interest threatened, and the probability and extent of the harm, against the value of the interest which the actor is seeking to protect, and the expedience of the course pursued." Prosser and Keeton on the Law of Torts (W. Page Keeton, ed., 5th ed.1984) § 31, at 173 (emphasis added). I will not cite the countless law review articles that have been written on the subject.
Finally, the absence of cost-benefit considerations in determining whether to impose a duty would surrender the analysis to indecipherable normative judgments by courts which is exactly what has happened in this case.
[25] The majority leaves the implications of its decision to the Florida Public Service Commission, as the "arm of the legislative branch" charged with regulating public utilities. With limited exceptions, not relevant here, the commission's jurisdiction is limited to "public utilities." The majority neglects the fact that Clay Electric is a "non-generating rural electric cooperative." See Florida Public Service Comm'n, Statistics of the Florida Electric Utility Industry 4 (2001). Cooperatives are joint ventures organized for the purpose of supplying electricity to a specified area. Under section 366.02, Florida Statutes (2002), such entities are not considered "public utilities" and therefore, with limited exceptions, are outside the regulatory scope of chapter 366. The majority cites section 366.02(2), Florida Statutes (2002), defining "electric utility." Majority op. at 1190 note 14. However, "electric utility" and "public utility" are not interchangeable for purposes of the commission's jurisdiction. "Public utility" is a narrow subset of "electric utility," and does not include rural electric cooperatives. Because rural electric cooperatives are not "public utilities," they are excluded from the commission's rate change jurisdiction. See Amerson v. Jacksonville Elec. Auth., 362 So.2d 433, 434 (Fla. 1st DCA 1978).