910 So.2d 405 (2005)
Michael BIGLEN, Appellant,
v.
FLORIDA POWER & LIGHT COMPANY, Warr Properties, L.L.C., American Aerial Lift, Inc., a Florida corporation, Prime Service, Inc., a Delaware corporation, authorized to do business in the State of Florida, and Town of Davie, a political subdivision of the State of Florida, Appellees.
No. 4D04-1214.
District Court of Appeal of Florida, Fourth District.
September 21, 2005.
*406 David B. Pakula of David B. Pakula, P.A., Pembroke Pines, and D. Fredrico Fazio of Fazio, DiSalvo, Cannon, Abers, Podrecca, Fazio & Carroll, Fort Lauderdale, for appellant.
E. Bruce Johnson and Tamara M. Scrudders of Johnson, Anselmo, Murdoch, Burke, Piper & McDuff, P.A., Fort Lauderdale, for appellee Florida Power & Light Company.
David M. McDonald of McLuskey & McDonald, Miami, for appellee Warr Properties, L.L.C.
GROSS, J.
Michael Biglen, the plaintiff in a negligence case in the circuit court, appeals a summary final judgment entered in favor of Florida Power & Light Company. We affirm, because FP & L owed no legal duty to Biglen under the circumstances of his accident, so that his negligence action must fail.
On August 30, 2000, Biglen was injured while operating a Trailblazer 40, an aerial lift machine, that came into contact with an overhead power line owned and maintained by FP & L. Biglen worked as a mechanic for Ocean Equipment & Supply, Inc., which rented trucks with aerial lifts that were stored on property in Davie, Florida.
The company stored about 200-250 trucks with aerial lifts on the property. The aerial lifts came in different sizes and heights. Typically, Ocean Equipment employees would park the machines facing south, with the booms projecting to the north, away from the power lines. By storing the machines with the booms raised, the company was able to squeeze the lifts more closely to each other, thus making room for more equipment on the property. To park, an employee would typically drive the lift into place, get out of the basket, and then raise the boom, using controls located on the side of the machine.
Three FP & L overhead power lines ran 30-31 feet above the southern edge of the property. Three utility poles supported the power lines; the poles were 2 to 2½ feet north of the property line, within FP & L's ten-foot utility easement. The power lines and utility poles were installed before 1985, when the property was vacant. The 1987 National Electrical Safety Code required a twenty-foot clearance for above ground power distribution lines. The 1997 version mandated a clearance of 18.5 feet.
In 1987, American Aerial Lift, Inc. replatted the property and agreed to the ten-foot easement for the existing power lines. American Aerial, and later Prime Equipment, Inc., developed and used the property for aerial lift businesses, storing up to *407 300 aerial lifts at the site. In 1999, Ocean Equipment leased the property and continued to store aerial lifts.
Biglen's job responsibilities included parking the machines for storage, and then raising the booms into the desired position. On the day of the accident, his supervisor, Butch Gonzalez, asked him to raise the boom of a Trailblazer 40 that had been parked near the fence that ran along the southern end of the property. Although the boom of this truck had previously been raised, it had fallen and was resting on another machine. Gonzalez expected Biglen to raise the boom on the Trailblazer 40 no more than a foot to a foot and a half to provide the necessary clearance to move the other machine.
Biglen stood on the ground next to the Trailblazer 40 and used the control box to lift the boom. Biglen continued raising the boom higher and higher, until the basket attached to the boom struck the FP & L power line. Biglen received an electrical shock and suffered injuries. A co-worker who watched this incident did not understand why Biglen raised the boom so high; the power lines at the south side of the property were "open and obvious to [even] the casual observer," with nothing blocking Biglen's view.
Ocean Equipment's employees all knew that they should stay at least ten feet away from the power lines.[1] Biglen acknowledged that he would always look up when he was moving a boom, and would be as safe as possible to avoid power lines. Although Biglen had no memory of the accident, he conceded that the power lines were plainly visible.
Biglen knew that he could be seriously injured if any part of the aerial lift came into contact with a power line. Warning labels on the Ocean Equipment machines specifically cautioned of the danger of hitting power lines. The warnings noted that the equipment must stay at least ten feet away from power lines and advised of the dangers of electrocution.
The machine involved in the accident had a warning label informing users, in bold print, to "keep away from machine if near electrical lines or equipment," and that "death or serious injury will result from contact with this machine if it should be electronically charged." The machine also displayed a picture of a person who is electrocuted while operating a lift that touches a power line.
Biglen read and understood operation manuals for aerial lifts, which warned of the dangers of coming into contact with power lines. He read the safety manual for the Trailblazer 40, which contained boldfaced warnings of "electrocution hazards" and set forth the requirement that an operator "must maintain a clearance of at least 10 feet between any part of the machine, or its load, and any electrical line or apparatus. . . ."
In his second amended complaint, Biglen's claim against FP & L contended that the company negligently constructed, placed, and maintained the overhead power lines along the southern property line, that FP & L knew or should have known that the purpose of the property was for storing aerial lifts, and that FP & L had negligently allowed its power lines to remain in close proximity to the southern property line.
In response to FP & L's motion for summary judgment, Biglen filed the affidavit *408 of expert Robert C. Peters, who opined that FP & L violated Rule 234 of the National Electrical Safety Code. Because of this violation, Peters asserted that it was "imperative" that FP & L "provide safe horizontal clearance to objects adjacent to the line as specified by Rule 234." It was his opinion that a utility easement of sufficient width be maintained "to assure that objects cannot be placed at an unsafe horizontal distance from the supply line." Peters noted that a fence at least fifteen feet from the center of the distribution poles was required to assure the proper clearance "as specified in Rule 234." Because the existing fence was less than eight feet from the center of the poles, his opinion was that FP & L violated this rule.
A cause of action based on negligence is comprised of four elements; the first is a "duty, or obligation, recognized by the law, requiring the [defendant] to conform to a certain standard of conduct, for the protection of others against unreasonable risks." Clay Electric Coop., Inc. v. Johnson, 873 So.2d 1182, 1185 (Fla.2003) (quoting W. PAGE KEETON ET AL., PROSSER AND KEATON ON THE LAW OF TORTS, 164-65 (5th ed.1984)). It is this element, the existence of a legal duty on the part of FP & L, that is central to this case.
Whether a duty exists is a question of law for the court. Goldberg v. Fla. Power & Light Co., 899 So.2d 1105, 1110 (Fla.2005). Although the supreme court has written that a duty may arise from four general sources, if a duty exists here, it must arise from the fourth categorythe general facts of the case. See Clay Elec., 873 So.2d at 1185 (identifying the "four general sources" of the principle of "duty" in a negligence action).
The supreme court has made foreseeability the polestar to finding both the existence of a legal duty and its scope; "whenever a human endeavor creates a generalized and foreseeable risk of harming others," which the court describes as a "foreseeable zone of risk," the law generally places a duty upon a defendant "`either to lessen the risk or see that sufficient precautions are taken to protect others from the harm that the risk poses.'" McCain v. Fla. Power Corp., 593 So.2d 500, 503 (Fla.1992) (quoting Kaisner v. Kolb, 543 So.2d 732, 735 (Fla.1989)). The existence of a legal duty means that a defendant stands in a "`relation to the plaintiff as to create [a] legally recognized obligation of conduct for the plaintiff's benefit.'" Palm Beach-Broward Med. Imaging Ctr., Inc. v. Cont'l Grain Co., 715 So.2d 343, 344 (Fla. 4th DCA 1998) (quoting PROSSER AND KEATON § 42, at 274). The absence of a foreseeable zone of risk means that the law imposes no legal duty on a defendant, and therefore defeats a negligence claim.
Although electric utilities are not insurers, the supreme court has imposed upon them a "greater-than-usual duty of care in proportion to the greater-than-usual zone of risk associated with the business enterprise they have undertaken." McCain, 593 So.2d at 504. Power generating equipment "creates a zone of risk that encompasses all persons who foreseeably may come in contact with that equipment." Id. As the supreme court has explained:
Electricity has unquestioned power to kill or maim. This is the precise reason the duty imposed upon power companies is a heavy one, because the risk defines the duty. Thus, if there is any general and foreseeable risk of injury through the transmission of electricity, the courts are not free to relieve the power company of this duty.
Id. (citation omitted).
In Palm Beach-Broward Medical Imaging Center, we described the application of the foreseeable zone of risk test:

*409 In applying the "foreseeable zone of risk" test to determine the existence of a legal duty, the supreme court has focused on the likelihood that a defendant's conduct will result in the type of injury suffered by the plaintiff. This aspect of foreseeability requires a court to evaluate
whether the type of negligent act involved in a particular case has so frequently previously resulted in the same type of injury or harm that `in the field of human experience' the same type of result may be expected again.

Pinkerton-Hays Lumber Co. v. Pope, 127 So.2d 441, 443 (Fla.1961). Thus, in McCain, the supreme court held that power-generating equipment created "a zone of risk that encompasses all persons who foreseeably may come in contact with that equipment." McCain, 593 So.2d at 504. In [Florida Power & Light Co. v.] Periera, [705 So.2d 1359, 1361 (Fla.1998)] the court found that the utility's maintenance of a guy wire on a bicycle path created a zone of risk that included bicyclists and motorcyclists using the path. In City of Pinellas Park v. Brown, 604 So.2d 1222, 1225-26 (Fla.1992), the court held that a negligently conducted high-speed police chase involving a large number of vehicles on a public street created a zone of risk encompassing innocent motorists on the roadways.
715 So.2d at 345 (emphasis added in original).
Finding that a legal duty exists in a negligence case involves the public policy decision that a "defendant should bear a given loss, as opposed to distributing the loss among the general public." Levy v. Fla. Power & Light Co., 798 So.2d 778, 780 (Fla. 4th DCA 2001), rev. den. 902 So.2d 790 (Fla.2005). A legal "[d]uty is an allocation of risk determined by balancing the foreseeability of harm, in light of all the circumstances, against the burden to be imposed." Id. (quoting Vaughan v. Eastern Edison Co., 48 Mass.App.Ct. 225, 719 N.E.2d 520, 523 (1999)).
Under the facts of this case, the foreseeable zone of risk created by the placement of the power lines did not extend to cover Biglen's operation of the aerial boom. The law did not impose the legal duty upon FP & L to lessen the risk that, in attempting to comply with Ocean Equipment's storage policy for its machines, an employee's negligent operation of an aerial lift would cause it to come into contact with the power lines.
Richmond v. Florida Power & Light Co., 58 So.2d 687 (Fla.1952), supports the conclusion that a plaintiff's unforeseeably negligent conduct does not fall within the zone of risk created by a power company's electric lines. Standing in his yard, with electric wires "in plain sight" 100 feet away, the Richmond plaintiff flew a kite with a long copper wire that "served as a kite cord." Id. at 688. The plaintiff was injured when the kite wires came into contact with the power lines. The supreme court refused to "enlarge" the power company's legal duty "to protect" the plaintiff.
The court reasoned that (1) the plaintiff knew that his kite's contact with the electric wire would "cause shock;" (2) the electric wires were in plain sight; and (3) the plaintiff "would be expected to anticipate danger" in flying the kite under the circumstances of the case. Id. In holding that no legal duty existed, the court engaged in a policy analysis to explain why the power company should not bear the loss:
[T]he need for successful distribution of so necessary a commodity cannot be defeated *410 by requiring that every conceivable protection be afforded wherever wires carrying it may go, so that anyone who chances to come near may be saved from injury in anything he decides to do, however unpredictable.
Id.
There is no significant difference between this case and Richmond. The power lines were in plain view. Biglen knew that contact between the aerial lift and the power lines would injure him. Given the extensive warnings on the machine and in the owner's manual, Biglen would be expected to anticipate the danger of raising the boom to within even 10 feet of the power lines. Like the kite flyer in Richmond, Biglen's conduct was the type of unpredictable negligence with respect to the power lines that falls outside of the power company's zone of risk.
A number of district court of appeal decisions also support the conclusion that no legal duty existed in this case.
The case most similar to this one is Smith v. Florida Power & Light Co., 857 So.2d 224 (Fla. 2d DCA 2003), rev. den., 873 So.2d 1224 (Fla.2004), where the second district concluded that FP & L had no duty to protect an operator who was injured when his crane made contact with an overhead power line.
In Smith, the plaintiff worked at a construction site as an employee of a general contractor which had contracted to install a culvert/drainage system under public streets. At a meeting before the work began, the subject of FP & L's overhead power lines arose. Id. The power company's representative said it would charge as much as $20,000 to relocate the overhead power lines at the construction site. Id. To avoid this cost, the general contractor decided that its employees would safely work around the lines. Id. As in the instant case, the applicable safety requirements mandated a minimum clearance of ten feet between the overhead lines and any equipment to be used around the lines. Id. at 227-28.
On the day of the accident, the Smith plaintiff was working underground in a culvert assisting in the placement of the tugger.[2] While the plaintiff was holding the crane cable, the crane operator tried to move the tugger. The cable from the crane's boom came too close to the power lines. Current from the lines flowed through the cable into the plaintiff, causing serious injuries. Id. at 228.
As in this case, the power lines in Smith were clearly visible and in plain view of the workers at the site, the power lines complied with all applicable safety codes, and those responsible for operating the crane knew the importance of maintaining a minimum ten-foot clearance.
In Smith, the third district held that (1) the power company's knowledge of a construction project in proximity to power lines is not alone sufficient to create a zone of risk with respect to those working on the project and (2) the fact that a power company truck passed the construction site was "not sufficient to establish that the power company had knowledge that the crane would be used under its power lines in an unsafe manner." Id. at 236.
Smith distinguished circumstances involved in cases where "a legal duty has been imposed on a power company to protect against injury caused by contact with the company's power lines."

*411 This case does not involve work performed for FPL. Here there is no allegation that FPL violated any safety code. There is no claim that FPL undertook to protect against a particular risk posed by its lines during the construction work and did so in an inadequate manner. And there is no evidence that FPL had knowledge of existing conditions or recurring activities in proximity to its lines that foreseeably created a risk of injury.
Id. at 236. We agree with the analysis in Smith which supports the holding in this case that no legal duty existed.
Following Smith, Barranada v. Florida Power Light Co., 905 So.2d 167 (Fla. 3d DCA 2005), held that a power company was not under a duty to protect a plaintiff from its power lines.
The Barranada plaintiff was employed as a sprinkler installer at a building under construction. He used an improvised pulley in the alleyway adjacent to the building to hoist twenty-one foot long metal pipes into a building. Id. at 168. One of the pipes came into contact with an uninsulated power line located on the opposite side of the alleyway, nearly fifteen feet away from the building at the construction site. Id. As a result, the plaintiff was injured. Id.
In holding that the power company owed no duty to the plaintiff, the third district found it significant that: 1) the location of the power line met the National Electric Safety Code standards, which required a distance of 7 feet 5 inches from the building; 2) the power company was never asked to take any preventive measures; 3) the contractor determined that it could work safely around the overhead power lines and therefore never asked the power company to reroute, de-energize, or insulate the power lines; and 4) "it was not reasonably foreseeable that the workers would not follow the suggested plan of not using the alleyway for delivery of materials." Id. at 168-69; see also Rice v. Fla. Power & Light Co., 363 So.2d 834 (Fla. 3d DCA 1978); Dudding v. Fla. Keys Elec. Coop. Assoc., Inc., 105 So.2d 597 (Fla. 3d DCA 1958).
Applying Richmond, Smith, and Barranada, we conclude that FP & L owed no legal duty to Biglen in this case. The lines were installed in 1985, before the property was being used for any purpose. The 30 to 31 foot height of the lines exceeded applicable safety standards.[3] Once companies began to use the property to park aerial lift machines, nothing in the record demonstrates that FP & L knew, or should have known, that such an operation would lead to booms coming near the power lines. It was Biglen's employer, Ocean Equipment, which required that the booms be raised to implement the storage policy of maximizing the number of machines that could be placed on the property. Numerous warnings made the employees *412 aware of the dangers posed by the power lines, which were in plain view. Assuming that FP & L was aware aerial lift machines were raised for storage on the site, it was not reasonably foreseeable that an employee would carelessly and unreasonably violate the company's guidelines, training, and the clear warning labels on the machine itself, and lift the boom far beyond the one or two feet necessary to complete the task, so high that it contacted a power line.
We distinguish this case from a case cited by Biglen, Duff v. Florida Power & Light Co., 449 So.2d 843 (Fla. 4th DCA 1984). There, a minor was injured when a CB antenna he was installing on the roof of his residence came into contact with a power line that ran across an easement adjacent to the boy's residence. Id. at 844. Although we noted that the location of the power line was beyond the clearance required by the NESC, we wrote that compliance with the code was but one factor in determining whether a duty existed. Id.
In imposing a duty, we reflected that "the propriety of the wires depends upon their location in the particular setting, which includes the typical activities occurring there." Id. Significantly, while the power line was over 21 feet high at the point of contact, the elevation of the roof overhang at the point of contact was over 8 feet. Id. Because it could not be said that the installation of an antenna was unforeseeable, we held that FP & L had a duty to take reasonable precautions with regard to this activity. Id.
Unlike the commercial property in this case, the setting of Duff was a residential neighborhood. It is foreseeable that homeowners will engage in activities on their roofs that will bring them close to power lines. Satellite dishes and antennae of various designs are a fact of modern life. Untrained adults and even children often tinker with such devices around their homes. This situation differs from the commercial property in this case, where some degree of training and sophistication is to be expected from those operating construction machinery.
Finally, we address Biglen's contention that the power company violated Rule 234 of the NESC. Biglen's expert contended that FP & L's violation of the rule was a deviation from the appropriate standard of care. The rule does not apply to this case. Rule 234 provides the minimum horizontal clearance from power lines. The plain language of the rule demonstrates that it does not apply to a mobile structure, such as an aerial lift machine, which may move from place to place.
The title of Rule 234 addresses, "Clearance of Wires, Conductors, and Cables Passing By but Not Attached to Buildings and Other Installations Except Bridges." Specific provisions of the rule require horizontal clearance of wires from: "1) Buildings, and 2) Signs, chimneys, billboards, radio and television antennas, tanks and other installations not classified as buildings and bridges."
Biglen contends that the phrase "other installations" is "broad enough to encompass a moveable object that is placed in a stationary position for a long period of time." This interpretation ignores the plain meaning of the word "installation," which entails the placement of an object into a location from which it is not expected to move, and is therefore immobile.
Affirmed.
STONE and SHAHOOD, JJ., concur.
NOTES
[1] Biglen's statement of facts indicates that during the twelve-year period preceding the accident, "it would have been plainly visible to FP & L personnel that booms of the parked aerial lift machines came within a perilously close horizontal distance from the power lines." The record evidence does not support this statement.
[2] A "tugger" is an air operated device for hoisting or pulling, similar to a slusher or winch. Compressed Air Management Impact RM Inc., Company Website Glossary of Terms, at http://www.impactrm. com/html/t.html.
[3] Section 366.04(6), Florida Statutes (2004), provides that following the standards under the National Electric Safety Code "shall constitute acceptable and adequate requirements for the protection of the safety of the public, and compliance with the minimum requirements of that code shall constitute good engineering practice by the utilities." The NESC required a vertical clearance of 20 feet above ground when the power lines were installed in 1987, which decreased to 18.5 feet at the time of this accident. The record is undisputed that the power line was 30-31 feet above ground. Compliance with the NESC is not a complete defense in a negligence action. Fla. Power Corp. v. Willis, 112 So.2d 15, 17 (Fla. 1st DCA 1959) (holding that compliance with NESC minimum standards is "a factor which may be considered by a jury in determining the issue of negligence"). However, compliance with these standards is a factor germane to a court's evaluation of foreseeability in deciding whether a legal duty exists.