DAMOORGIAN, J.
Appellants, Plaintiffs below, appeal the final judgment arising out of an order granting Appellees’, Alan and Jill Miller’s (“Millers”), motion for directed verdict. Appellants argue that the trial court erred in directing a verdict against them. We disagree and affirm.
This case arises out of a liquid propane gas explosion which occurred at the vacation home of the Millers. The explosion destroyed the Millers’ residence and damaged several neighboring properties, including those owned by Joseph and Eva Gyongyosi and Arthur L. Carter. The Gyongyosis and Carter filed a complaint against multiple defendants, including the Millers, for damages sustained to their homes from the explosion. Lexington Insurance Company, as well as other insurance companies, also filed a complaint against multiple defendants including the Millers.[1] The two complaints were ultimately consolidated and included counts for (i) ordinary negligence; (ii) negligence based on violations of various statutory, gas, and building code provisions; and (iii) vicarious liability against the Millers. Voluntary dismissals and settlements removed the other defendants from the action and the case against the Millers proceeded to trial.
The evidence presented during Plaintiffs’ case established that before the explosion, the Millers contracted Timothy Menzer to replace the floor tiles on the sun deck over their garage. Located below the concrete roof sun deck was a concealed gas line. This gas line was partially suspended from the garage ceiling by hangers, which were attached to the underside of the sun deck. Portions of the gas line were visible from the corners of the interi- or of the garage. There was no indication that any part of the gas line was located on top of the deck where Menzer was working. The Millers testified that they had no knowledge of the location or existence of the propane tank and no knowledge of the existence or location of the piping.
While working on the sun deck, Menzer used a chipping hammer to remove the existing floor tiles. The concrete roof deck was not damaged or penetrated during the process of removing the floor tile. Menzer did not come close to where the gas pipe was suspended. Sometime after Menzer finished removing the floor tile on the sun deck, an explosion occurred damaging the Millers’ property as well as the *1073 homes owned by Joseph and Eva Gyon-gyosi and Arthur L. Carter.
Plaintiffs presented two experts whose testimony supported the following explanation as to the cause of the explosion. Two of the five hangers, which were used to suspend the gas pipe from the garage ceiling (the underside of the sun deck), had detached from the ceiling, causing the gas pipe to sag. The sagging in turn caused additional tension on the system, initiating a fracture at an elbow joint of the piping system. This fracture allowed gas to leak. The leaking gas was likely ignited by a water heater pilot light located adjacent to the garage, resulting in the explosion. The cause of the hangers detaching was likely from vibrations created by Menzer’s use of the chipping hammer above the garage.
In addition to the causation experts, Plaintiffs also presented the testimony of James McKay, a professional engineer and registered architect with experience in construction and demolition. His testimony related to certain safeguards promulgated by the National Fire Protection Association (“NFPA”), incorporated by the town’s building codes. In particular, his testimony concerned NFPA 241 entitled “Standard for Safeguarding Construction, Alteration, and Demolition Operations.”[2] NFPA 241 does not define demolition, and Plaintiffs sought to elicit testimony from McKay that Menzer’s work constituted demolition, subjecting it to the requirements of NFPA 241.[3] The trial court required Plaintiffs to proffer this testimony outside the presence of the jury. During this proffer, McKay opined that the work performed on the sun deck constituted demolition. He focused on the fact that the method chosen to remove the floor tile, i.e. with a chipping hammer, presented a potential hazard to the substrate of the roof deck. After considering McKay’s testimony, the trial court ruled that as a matter of law the work performed by Menzer was not “demolition” because that term should be defined by the “scope of the work to be performed, not the manner in which it is performed.”
In the presence of the jury, McKay was offered as an expert witness in the areas of standard of care of contractors performing alteration and demolition work. McKay was not allowed to testify concerning whether Menzer’s work constituted demolition. However, he was allowed to testify that Menzer’s work neither met the requirements of NFPA 241 nor met any reasonable standard of care for a contractor doing that type of work. McKay testified that before commencing the work, Menzer should have surveyed the area, both inside and adjacent to the work area, and identified potential hazards including utility lines. He also opined that the Millers failed to satisfy the requirements of NFPA 241.
At the close of the Plaintiffs’ case, the Millers made multiple motions for directed verdict with respect to the vicarious liability and negligence counts. The trial court granted the Millers’ motions and in an order concluded, as a matter of law, that the work performed by Menzer was not “demolition” under NFPA 241 and not an “ultra-hazardous activity.” The court fur *1074 ther concluded that NFPA 241 was not specifically pled in the amended complaints and there was no evidence of a violation of NFPA 241. Additionally, the chain of events leading to Plaintiffs’ damage was not foreseeable as a matter of law, and the Millers, as homeowners, had no duty to know the location or operation of latent piping systems in their house. Finally, the trial court held that, as a matter of law, no reasonable jury could find that the evidence presented in Plaintiffs’ case established any liability on the Millers’ behalf. This appeal follows.
The standard of review applicable to a ruling on a motion for directed verdict is de novo. Meruelo v. Mark Andrew of Palm Beaches, Ltd., 12 So.3d 247, 250 (Fla. 4th DCA 2009). “ ‘When an appellate court reviews the grant of a directed verdict, it must view the evidence and all inferences of fact in a light most favorable to the nonmoving party, and can affirm a directed verdict only where no proper view of the evidence could sustain a verdict in favor of the nonmoving party.” Id. (quoting Frenz Enters., Inc. v. Port Everglades, 746 So.2d 498, 502 (Fla. 4th DCA 1999)).
We first address whether the trial court erred in determining that the work performed by Menzer was not demolition as a matter of law. Our resolution of this issue necessarily requires us to decide whether Appellants’ expert should have been permitted to testify that the work performed constituted a “demolition,” making NFPA 241 applicable. Expert testimony may be presented in the form of an opinion “[i]f scientific, technical, or other specialized knowledge will assist the trier of fact in understanding the evidence or in determining a fact in issue.... ” § 90.702, Fla. Stat. (2009). The admission of expert testimony has been allowed to explain the character of an object in order to determine if it complies with a statute, ordinance, or code. See Noa v. United Gas Pipeline Co., 305 So.2d 182 (Fla.1974) (allowing expert testimony regarding whether a spurline constituted a service line as defined in the relevant regulations); see also Chimeno v. Fontainebleau Hotel Corp., 251 So.2d 351 (Fla. 3d DCA 1971) (holding that expert testimony may be adduced to show the presence or absence of the elements which call a regulatory ordinance’s application into play).
In Noa, upon which Appellants primarily rely, the trial court allowed expert witness testimony on the issue of whether a spurline was a “service line” as defined by the relevant statute. Noa, 305 So.2d at 183-84. The evidence was essential to the plaintiffs negligence claim against the defendant for failure to comply with the statute’s requirement to odorize gas running through a service line. Id. There was conflicting expert testimony on the issue of whether the spurline constituted a “service line.” Id. at 185-86. On appeal, the district court held that the expert should not have been permitted to testify as to the interpretation of a regulatory definition. Id. at 184. The Florida Supreme Court reversed the district court, holding that the issue of “whether the spurline leading from the main pipeline ... was a service line ... within the contemplation of the ... regulations” was a factual question, which an expert engineer could properly testify about, and was “not readily answerable by the trial judge referring to the cold language of the regulations.” Id. at 185. The Florida Supreme Court concluded that at the very least, the conflicting expert testimony as to the applicability of the regulations created a question of fact for the jury. Id. at 186.
Similarly, in Chimeno, plaintiff filed a negligence action against a hotel and elevator company for injuries sustained *1075 through use of a freight elevator at the hotel. Chimeno, 251 So.2d at 351, 353. At trial, there was conflicting testimony as to whether there was a violation of a city ordinance relating to freight elevators. The ordinance specified a certain requirement, which was absent in the elevator in question, but provided an exception for “‘elevators having automatic or continuous-pressure operation.’ ” Id. at 353. The conflicting expert testimony at issue in Chimeno pertained to whether the hotel’s freight elevator fell within this exception, making the ordinance inapplicable. Id. The district court described the testimony as relating to the “character” of the elevator. Id. at 353-54.
This case is readily distinguishable from Noa and Chim,eno. Here, McKay did not testify about the character of an object nor did he give testimony regarding disputed facts, which could determine the requirements of NFPA 241. Instead, Plaintiffs offered McKay’s opinion that NFPA 241 applied to the work under contract in this case based on McKay’s own definition of demolition. McKay’s testimony was not necessary to determine whether removal of floor tile constituted demolition in order to apply NFPA 241 where demolition was not given a specific meaning in the regulation.
Instead, the question of what is meant by demolition in NFPA 241 is a question of law, subject to determination by the trial court. See Osborne v. Dumoulin, 55 So.3d 577, 581 (Fla.2011) (“The determination of the meaning of a statute is a question of law and thus is subject to de novo review.”); Edward J. Seibert, A.I.A., Architect & Planner, P.A. v. Bayport Beach & Tennis Club Ass’n, 573 So.2d 889, 891-92 (Fla. 2d DCA 1990) (holding that experts should not be allowed to testify concerning questions of law, and the interpretation of a building code presented a question of law); Devin v. City of Hollywood, 351 So.2d 1022, 1026 (Fla. 4th DCA 1976) (“We also hold that the trial court erred in relying upon expert testimony to determine the meaning of terms which were questions of law to be decided by the trial court.”). Contrary to Appellants’ position, the word demolition does not create any ambiguity requiring expert testimony to assist the trier of fact in applying the pertinent regulation because it is neither a technical term nor did the regulation provide a specific definition that was contrary to its ordinary meaning. Therefore, the trial court did not err in prohibiting an expert from defining the term demolition in NFPA 241 for the jury. See Lee County v. Barnett Banks, Inc., 711 So.2d 34, 34 (Fla. 2d DCA 1997) (“Statutory construction is a legal determination to be made by the trial judge, with the assistance of counsels’ legal arguments, not by way of ‘expert opinion.’ ”).
When a term is not defined, courts must look to its plain and ordinary meaning, which can be discerned from a dictionary. Sosa v. Safeway Premium Fin. Co., 73 So.3d 91, 104 (Fla.2011). The American Heritage Dictionary defines demolition as “the act or process of wrecking or destroying, especially] destruction by explosives.” American Heritage Dictionary 380 (2d Coll. ed. 1985). Although not defining demolition, Black’s Law Dictionary defines the term “demolish” as “[t]o destroy totally or to commence the work of total destruction with the purpose of completing the same.” Black’s Law Dictionary 432 (6th ed. 1995). The act of removing floor tiles with a chipping hammer in a manner that does not affect the integrity of the structure — as was done here — cannot constitute demolition as contemplated by NFPA 241. Concluding otherwise would defy common sense. As such, we affirm the trial court’s entry of a directed *1076 verdict on the issue of NFPA 241 because the trial court properly concluded that Menzer’s work was not “demolition” under the code.
Because we affirm the trial court’s conclusion that the tile removal and replacement did not constitute demolition as the term is used in NFPA 241, we need not address whether Plaintiffs properly pled a claim for negligence based on a breach of the requirements of NFPA 241.
We next address whether the trial court erred in its determination, as a matter of law, that the removal and replacement of tile was not an ultrahazardous/in-herently dangerous activity. Appellants argue that whether a particular activity is inherently dangerous is generally a question for the jury.
Florida courts allow for employers to be held vicariously liable for an independent contractor’s negligence under the inherently dangerous activities doctrine. Am. Home Assurance Co. v. Nat’l R.R. Passenger Corp., 908 So.2d 459, 468 (Fla.2005). This doctrine provides that a party who “ ‘employs an independent contractor to do work involving a special danger to others which the employer knows ... to be inherent in or normal to the work ... is subject to liability for physical ham caused to such others by the contractor’s failure to take reasonable precautions against such danger.’ ” Id. (quoting Restatement (Second) of Torts § 427 (1965)). An activity is inherently dangerous if the “danger inheres in the performance of the work,” such that “in the ordinary course of events its performance would probably, and not merely possibly, cause injury if proper precautions were not taken.” Fla. Power & Light Co. v. Price, 170 So.2d 293, 295 (Fla.1964) (involving worker injured while working on wires charged with high voltage electricity). This doctrine includes activities where there is a recognizable and substantial danger inherent in the work, even though a major hazard is not involved. Id.
We hold that danger does not inhere in the removal of floor tiles from a roof deck. Tile removal is not of such a nature that in the ordinary course of events, its performance would probably, and not merely possibly, cause injury if proper precautions were not taken. This Court finds American Automobile Ass’n, Inc. v. Tehrani, 508 So.2d 365 (Fla. 1st DCA 1987), analogous to the case at bar. In Tehrani the First District concluded that a jury should not have been permitted to consider whether operating a large wrecker was an inherently dangerous activity, and held that such activity was not inherently dangerous in the context of the case. Id. at 371. Similar to Tehrani, we hold that the trial court did not err in concluding, as a matter of law, that “in the context of this case,” the activity of removing tile from a roof with a chipping hammer was not inherently dangerous. See id.[4]
*1077 Further support for this outcome is derived from case law from outside this jurisdiction. See, e.g., W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 71, 512-16 (5th ed., West 1984) (identifying inherently dangerous activities as excavation, construction, blasting, fireworks, crop dusting, the clearing of land by fire, tearing down high walls or chimneys, and the construction of a dam) (collecting cases); Eastman Kodak Co. v. Martin, 362 F.2d 684 (5th Cir.1966) (finding the activity of dismantling an abandoned portion of a power line and the subsequent work to allow a company to reuse the dismantled poles and wire used for the power line inherently dangerous); Waite v. Am. Airlines Inc., 73 F.Supp.2d 349, 357 n. 8 (S.D.N.Y.1999) (“[IJnherently dangerous ... activities typically include: blasting, pile driving, certain types of excavations, fumigation of buildings with dangerous gasses such as cyanide, the emission of noxious gasses into densely populated areas, and the collection of large quantities of explosives or inflammable liquids in a populous area.”) (citations omitted); Chainani by Chainani v. Bd. of Educ. of City of N.Y., 87 N.Y.2d 370, 639 N.Y.S.2d 971, 663 N.E.2d 283, 287 (1995) (“Familiar examples of inherently dangerous activities are blasting, certain types of construction and working with high tension electric wires.”) (internal citation omitted). Neither the parties nor this Court have identified a case where tile removal — in the manner which occurred here — constituted an “inherently dangerous” activity.
Finally, Appellants contend that the Millers had a common law duty to warn Men-zer of the propane gas line existing below him, and that this issue should have been resolved by the jury. Thus, the trial court erred in directing a verdict on the direct negligence count based on its determination that the Millers had no duty to know the location or operation of the piping systems in their home. Appellants also allege that foreseeability in the context of proximate causation is a question of fact for the jury, and therefore, the trial court erred in ruling that “[t]he chain of events leading to Plaintiffs’ damage was not foreseeable as a matter of law.”
A cause of action based on negligence is comprised of four elements. Clay Elec. Coop., Inc. v. Johnson, 873 So.2d 1182, 1185 (Fla.2003). The first is a “duty, or obligation, recognized by the law, requiring the [defendant] to conform to a certain standard of conduct, for the protection of others against unreasonable risks.” Id. (quoting W. Page Keeton et al., Pros-ser and Keeton on the Law of Torts, § 164-65 (5th ed., West 1984)). Whether a duty exists is a question of law for the court. Goldberg v. Fla. Power & Light Co., 899 So.2d 1105, 1110 (Fla.2005). While the supreme court has identified four general sources from which a duty may arise, here, a duty must arise from the fourth category-general facts of the case. See Clay Elec. Coop., Inc., 873 So.2d at 1185.
The Florida Supreme Court has explained:
[F]oreseeability relates to duty and proximate causation in different ways and to different ends. The duty element of negligence focuses on whether the defendant’s conduct foreseeably created a broader “zone of risk” that poses a general threat of harm to others. The proximate causation element, on the other hand, is concerned with whether and to what extent the defendant’s conduct foreseeably and substantially caused the specific injury that actually occurred.
McCain v. Fla. Power Corp., 593 So.2d 500, 502 (Fla.1992) (internal citations omitted). In Palm Beach-Broward Medical Imaging Center, Inc. v. Continental Grain *1078 Co., 715 So.2d 343 (Fla. 4th DCA 1998), we described the application of the foreseeable zone of risk test to determine the existence of legal duty, explaining that the focus should be on “the likelihood that a defendant’s conduct will result in the type of injury suffered by the plaintiff.” Id. at 345. “This aspect of foreseeability requires a court to evaluate ‘whether the type of negligent act involved in a particular case has so frequently previously resulted in the same type of injury or harm that ‘in the field of human experience’ the same type of result may be expected again.’ ” Id. at 345 (quoting Pinkerton-Hays Lumber Co. v. Pope, 127 So.2d 441, 443 (Fla.1961)). “The absence of a foreseeable zone of risk means that the law imposes no legal duty on a defendant, and therefore defeats a negligence claim.” Biglen v. Fla. Power & Light Co., 910 So.2d 405, 408 (Fla. 4th DCA 2005).
Under the facts of this case, if any foreseeable zone of risk was created by the Millers’ conduct, it did not extend to cover the type of injury suffered by Plaintiffs in this instance — i.e., a massive liquid propane gas explosion which damaged their properties. As noted earlier, the Millers did not even know that the piping in the garage existed. Moreover, the sun deck where Menzer was working to remove the floor tile did not contain any piping. The trial court properly determined that the Millers had no duty to advise an independent contractor about gas piping, which they had no knowledge of due to the fact that it was concealed in the garage below. More importantly, in light of the scope of work that Menzer was to perform, it was not reasonable for the Millers to anticipate the damage that occurred as a result of floor tile removal. Cf. Morales v. Weil, 44 So.3d 173, 176 (Fla. 4th DCA 2010) (explaining that where a homeowner hires an independent contractor, he or she is not liable for injuries sustained by that contractor’s employees in performing their work unless they actively participate in managing or performing the work). Because we conclude that there was no duty, we need not address the parties’ arguments relating to proximate causation.

Affirmed.

CIKLIN and LEVINE, JJ., concur.

. The insurance companies were subrogated to the rights of the insured property owners for damages paid as a result of the explosion.

. The trial court took judicial notice of the NFPA codes as adopted by the town, and the codes had also been stipulated into evidence.

. NFPA 241 requires in part, that existing systems be preserved during demolition, including utilities, and requires implementation of a fire safety program in all construction, alteration or demolition contracts, with the owner having the authority to enforce this program. It also requires the owner to designate a person responsible for a fire prevention program.

. Our reading of Florida cases where courts have found activities inherently dangerous involve situations where accidents resulting from such activities are likely to cause serious bodily injury or death. See, e.g., Channell v. Musselman Steel Fabricators, Inc., 224 So.2d 320 (Fla.1969) (trial court properly relied upon "inherently dangerous” theory where facts demonstrated that defendant's independent contractor utilized cable equipment to lift a load of steel beams, the cable snapped, and plaintiff was injured by the load); Baxley v. Dixie Land & Timber Co., 521 So.2d 170 (Fla. 1st DCA 1988) (the trial court found "the cutting, loading and delivering of logs” to be "inherently dangerous work” where an individual was killed at a logging site). These cases stand in stark contrast to the instant case where accidents caused by the removal of floor tile are not likely to result in serious bodily injury or death.