[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
April 23, 2008
THOMAS K. KAHN
CLERK

_____

No. 07-11903
Non-Argument Calendar

_____

D. C. Docket No. 05-00263-CV-FTM-29-SPC

ALEX ZIVOJINOVICH,

Plaintiff-Counter-
Defendant-Appellant,

JUSTIN ZIVOJINOVICH,
MICHELLE ZIVOJINOVICH,

Plaintiffs-Appellants,

versus

FRANK BARNER,
RITZ-CARLTON HOTEL COMPANY, L.L.C.,
d.b.a. Ritz Carlton Naples,

Defendants-Appellees,

CHRISTOPHER KNOTT,
SCOTT RUSSELL,
AMY STANFORD,

Defendants-Counter-
Claimants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

**(April 23, 2008)**

Before BIRCH, DUBINA and CARNES, Circuit Judges.

PER CURIAM:

This is Justin and Alex Zivojinovich's appeal of the district court's grant of

summary judgment to the defendants on their § 1983 excessive force and

negligence claims.[1]

**I.**

The following are the facts viewed in the light most favorable to the

Zivojinovichs, which is how we are required to view them at this stage of the

proceedings.  See Tinker v. Beasley, 429 F.3d 1324, 1326 (11th Cir. 2005); Shotz

v. City of Plantation, Fla., 344 F.3d 1161, 1164 (11th Cir. 2003); see also Cottrell

v. Caldwell, 85 F.3d 1480, 1486 (11th Cir. 1996) ("[W]hat is considered to be the

---

[1]  Michelle Zivojinovich's name also appears on the plaintiffs' brief, but it does not
contain any contentions of error that relate to the one claim she brought, which was for false
arrest.  It is unclear whether she intended to appeal the grant of summary judgment to the
defendants on her claim, but, if she did, she has waived the appeal by failing to put forward any
arguments in this Court.  See Flanigan's Enters. v. Fulton County, 242 F.3d 976, 987 n.16 (11th
Cir. 2001) (holding that when a brief "fail[s] to elaborate or provide any citation of authority in
support of . . . [an] allegation," the issue is waived); Davis v. Hill Eng'g, Inc., 549 F.2d 314, 324
(5th Cir. 1977) (holding that merely mentioning in a brief that the district court erred, absent any
specific argument as to how the court erred, waives the issue on appeal).

'facts' at the summary judgment stage may not turn out to be the actual facts if the case goes to trial, but those are the facts at this stage of the proceeding for summary judgment purposes.").

On December 31, 2003, Justin Zivojinovich, his wife, Michelle, and his father, Alex, attended a black-tie New Year's Eve party at the Ritz-Carlton Hotel in Naples, Florida. The dance floor of the ballroom where the party took place was surrounded by dinner tables on three sides and had a small stage on the fourth side. The two bands that had been hired to play that night were alternating using the stage. At about 10:30 p.m., Justin began dancing boisterously. He circled the dance floor undulating his arms, danced with four women simultaneously, and eventually shoved apart a couple who were dancing and, without asking, began to dance with the woman. Immediately thereafter, Justin stepped onto the stage uninvited and said "Thank you, thank you. Let's give it up for the band, the next Count Basie.[2] Happy New Year's everyone, let's have a Happy New Year's." He then returned to his table.

At about 11:15 p.m., Justin began dancing again, this time with a male friend. The Ritz's night shift manager on duty, Frank Barner, saw Justin dancing

---

[2] William "Count" Basie (1904–1984) was a jazz bandleader and piano player. During his deposition, Justin said that the comment was intended as a compliment, although he was personally unfamiliar with Basie's music.

3

again and decided to call the sheriff's office to have deputies come to issue a trespass warning and escort Justin off the Ritz's property. He radioed the front desk and told Azure Sorrell, the employee working there, to call the sheriff's office. Then, to be sure that all of the relevant information was conveyed, he called the Collier County Sheriff's Office himself.

Barner told the dispatcher that there were "a couple of subjects being disorderly," "screaming[,] and yelling." Barner claimed that the subjects "jumped up on a stage," tried "to commandeer the bandstand," and "were giving . . . the band members a hard time." Barner also told the dispatcher that when he "tried to explain to [Justin] that he couldn't do that, he started yelling profanities, screaming, yelling and carrying on." In reality, Barner had not yet spoken to Justin.

Deputies Scott Russell and Chris Knott separately responded to the call. They were told only that there was a disturbance of some kind at the Ritz involving two men who were being unruly, refusing to cooperate, and getting onto the stage. After hearing that two deputies had gone to the Ritz, Deputy Amy Stanford decided to go there as well to provide back up.

When Sorrell spoke to the dispatcher, she requested that deputies come to remove "some disorderly people" who were "just basically trashing the place . . .

4

jumping on furniture, ripping things apart" and whom Ritz security personnel could not control. This was not true, but Sorrell's report was not relayed to any of the deputies who went to the Ritz to deal with the situation.

After dancing for a while, Justin and his friend got up on stage while one of the bands was playing. Justin's friend danced around while Justin went to the microphone. Alex, who had been dancing with his wife, joined them. Alex tapped on a conga drum in time with the music for about ten seconds before leaving the stage. A member of the band who was not playing at that time angrily told Justin to get off the stage, but Justin did not notice him. Justin tapped the microphone to see if it was on. It was not, and he and his friend stepped off the stage.

As he walked back to his table, Justin made an exaggerated bow to the other guests. One of them described it as mooning the band with his clothes on. At this point, Barner approached Justin. Barner told Justin that he was not allowed to go up on the stage where the band was playing and that, if he did it again, he would be removed from the property and charged with trespassing. Justin replied by asking him "What, no fun?" but returned to his table. While sitting there, Justin felt as though Barner was continuing to watch him. So, he turned to look at Barner and mouthed the words "Why don't you just fucking leave us alone?" before returning to his meal.

5

Around this time, all three deputies arrived in the ballroom. Deputy Knott, who had once worked security at the Ritz under Barner, approached Barner to ask what the disturbance was. Barner pointed out Justin and told Knott that he had been disruptive. Barner went on to recount an exaggerated version of conversation with Justin in which he made the following claims: When Barner told Justin that he would be removed from the hotel if he went on stage again, Justin said "Fuck off, who is going to remove me?" or "Fuck off, what are you going to do?" Barner replied, saying that he would call the police. Then Justin said something to the effect of "What are they going to do?" After detailing this version of events to Knott, Barner told him that he wanted Justin off the property and asked Knott to issue Justin a trespass warning so that he could not return.

Michelle had noticed Deputies Knott and Stanford come into the ballroom, and she told Justin that the police had arrived. A few minutes later, at approximately 11:35 p.m., Knott approached Justin from behind and tapped him on the shoulder. Knott asked Justin if he would "step to the back" so that the deputies could talk to him. Justin went with Stanford and Knott to a service hallway off the ballroom, where they asked Justin to sit. When Justin was seated, Knott told him that he could collect his belongings from the table and that he was going to be escorted from the property and given a trespass warning.

6

Justin returned to his table, retrieved his coat, told Michelle that he was being forced to leave, and went back to the hallway with Deputies Knott and Stanford. Alex and Michelle followed them into the hallway. Justin was again told to sit in the chair in the hallway. He did so, but he stood up again shortly thereafter. Stanford had to order him to sit down a second time.

During this period, Alex told Deputy Stanford: "Please, officer, we haven't done anything. It is New Year's Eve, we haven't done anything." Stanford replied that if he didn't stand back he would be arrested. He then asked her why she was "being so hostile? It is New Year's Eve," and told her that if she wanted them to leave, they would do so. Stanford again told him to stand back or he would be arrested. Alex replied "Arrest me, you're going to arrest me for what?"

Finally, the deputies took hold of Justin's arms and began to escort him out. Alex asked Deputy Knott "Please, why are you doing this? What is going on? It is New Year's Eve." Knott replied that Justin was being removed from the Ritz. Alex and Michelle followed as the deputies walked Justin out. While being escorted out, Justin said: "Please, I just want to go home. Just let me go home." Michelle replied: "It is fine, honey, I am right behind you to go home."

The deputies held Justin's arms as they walked him down the service hallway and into the stairwell. Deputy Knott held Justin's left arm without hurting

him. Deputy Stanford, however, pulled Justin's right arm up at an angle that did hurt. While walking toward the stairs, Alex continued asking the deputies not to remove Justin. At one point Knott screamed back over his shoulder at Alex. Justin then yelled that Stanford was hurting his arm, but she did not respond.

As Justin and the deputies were entering the stairwell, Justin lurched forward, pulled his arm partially free of Deputy Stanford's grip, and forced it straight. As Justin and Stanford were approaching the second landing in the stairwell, Deputy Knott pushed Justin, causing both Justin and Stanford to fall down the stairs. Justin landed on his chest. Deputy Stanford fell over him. After falling, both rose to their hands and knees. Justin then rolled over to sit with his back against the wall.

Alex and Deputy Knott ran down to the landing. Knott and Deputy Stanford began struggling with Justin, attempting to handcuff him. Knott pulled out his taser gun, aimed it at Alex, and told him to "back off" immediately. Alex held his hands out, palms open, at chest level and asked Knott not to hurt Justin. Alex shouted for Justin "not to move, not to struggle."

Deputy Knott then warned Justin that he would use his taser gun if Justin did not cooperate, but Justin did not hear him or did not understand him. Knott fired. The taser gun hit Justin in the torso, causing him to fall over. Alex attempted to

8

get to Justin so that he could cover Justin's body with his own, but Deputy Stanford held him back. As Alex continued to struggle, Stanford hit him on the right side of his face.

Alex turned to Deputy Stanford and said, "You hit me in the face. You hit me in the face, you fucking cunt." Stanford then lunged at him, grabbed him by the neck, and starting pushing him backwards down the stairs. Alex pushed her off and tried to climb up the stairs to where Justin was lying. Before he could get there, Deputy Russell, who had by then entered the stairwell, punched Alex on the left side of his face, breaking his nose. Someone pulled Alex down, and he fell to the next lower landing. When he regained focus, he was lying prone on his stomach, using his forearms to prop up his upper body. One of the deputies shouted at him to put his arms out. When Alex did not move, a deputy fired his taser gun into Alex's back. Alex fell forward into a pool of his own blood, temporarily paralyzed. Again, a deputy told him to straighten out his arms. Alex said that he was unable to move. The deputy shot Alex with his taser gun again.

Meanwhile, Justin had climbed back up to a sitting position, at which point Deputy Russell fired his taser gun, hitting Justin in the back. Michelle ran down to the landing where Justin was. He asked her "Why is this happening? Why are they doing this to me?" Michelle told him "Because he is an asshole." Russell

9

told Michelle to step back, but she did not want to move for fear that they would hurt Justin.

Deputy Russell told Michelle that she was going to go to jail. She said "fine" and called him "an asshole" again. She was told to go back and sit on the stairs, which she did. At no time did Michelle attempt to physically interfere with the deputies.

Finally, Justin, Alex, and Michelle were handcuffed and taken out the back of the hotel to the loading dock. Alex's handcuffs were so tight that he suffered numbness and tingling in the backs of his hands for about a year after his arrest. While being taken out, Alex turned to Deputy Knott and asked him: "How do you wake up in the morning and feel proud of who you are?" Because of his broken nose, Alex sprayed blood when he spoke. In reply, Knott said "You're spitting blood at me," to which Alex said "You think I am spitting blood at you. You should have thought of that before you broke my nose." Alex was either confused about who broke his nose or meant to refer to the deputies generally because it was Deputy Russell who had broken Alex's nose, not Knott.

Deputy Knott and another deputy who had arrived at the scene used their taser guns on both of Alex's shoulders. His legs gave out, but the deputies held him up. They sat Alex on the curb to wait for the ambulance to arrive. When

10

deputies put Justin in a patrol car, he turned to the deputy who was driving and said "Hell of a New Year's, hey?"

In April 2005, Justin was tried for resisting an officer with violence to his or her person, a violation of Florida Statute § 843.01, but, before the conclusion of the trial, he pleaded no contest to resisting without violence under Florida Statute § 843.02. At about the same time, Alex also pleaded no contest to resisting without violence. Although Michelle was originally charged with resisting without violence, the court dismissed the charge against her.

While the charges were still pending against them, the Zivojinovichs brought suit against Deputies Knott, Russell, and Stanford, as well as the Ritz and Barner. Their amended complaint had thirty-four claims, including one on behalf of Alex's business associates and various business entities that have financial interests in his career. The two claims that are relevant to this appeal are Justin and Alex's § 1983 Fourth Amendment excessive force claims against the deputies and their negligence claims against Barner and the Ritz. The deputies counterclaimed against Alex for negligence and battery, but those counterclaims are not included in this appeal.

The district court first granted summary judgment to the defendants on all the claims against them. It then declined to exercise supplemental jurisdiction over

the counterclaims against Alex and dismissed them without prejudice. Alex and Justin Zivojinovich now appeal the district court's grants of summary judgment. The other plaintiffs have decided not to appeal.

The Zivojinovichs contend that the district court erred in five different ways. First, they assert that the summary judgment rule is unconstitutional as applied because it allows the district court to impermissibly determine what verdict a rational jury might render. Second, they argue that the district court erred by not taking the facts in the light most favorable to them as non-moving parties. Third, they contend that the district court erred in granting summary judgment to Barner and the Ritz on Justin's negligence claim. Fourth, they claim that the district court erred in granting summary judgment to Barner and the Ritz on Alex's negligence claim. And, finally, they argue that the district court erred in granting summary judgment to the deputies on Alex's and Justin's excessive force claims. We will address each of these contentions in turn.

## II.

The Zivojinovichs' contention that Federal Rule of Civil Procedure 56(c), which governs summary judgment, has been unconstitutionally interpreted is meritless. The Federal Rules require a court to grant summary judgment if the record before the court "show[s] that there is no genuine issue as to any material

fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The Supreme Court has interpreted the word "genuine" in Rule 56(c) to mean that the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).

The Zivojinovichs' argument is that this interpretation unconstitutionally deprives them of their Seventh Amendment rights to a jury trial because it substitutes the judge's judgment about what a hypothetical reasonable jury could do for what a real jury would actually do. Even if we were persuaded by this argument, the Supreme Court is the final arbiter of constitutionality, and its interpretation is binding on us. Baker v. Carr, 369 U.S. 186, 211, 82 S. Ct. 691, 706 (1962) (The Supreme Court is the "ultimate interpreter of the Constitution."); Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177–78 (1803). We are without power to hold that the Supreme Court's interpretation is unconstitutional, nor would we if we could.

## III.

The Zivojinovichs' second contention is that the district court did not view the facts in the light most favorable to them, as it was required to do. See Tinker, 429 F.3d at 1326; Shotz, 344 F.3d at 1164. We review de novo the district court's

13

grant of summary judgment. Ala.-Tombigbee Rivers Coal. v. Kempthorne, 477 F.3d 1250, 1254 (11th Cir. 2007). As a result, any error in how the district court viewed the facts is mooted by our decision of the issue anew.

**IV.**

The Zivojinovich's third contention is that the district court improperly granted summary judgment to Barner and the Ritz on Justin's negligence claim. The Zivojinovichs argue that Barner acted negligently, breaching two asserted duties: (1) the duty to ask Justin to leave before calling law enforcement to eject him from the Ritz and (2) the duty to provide accurate information to law enforcement. The Ritz would be vicariously liable for Barner's negligence under the doctrine of respondeat superior. See Pope v. Winter Park Healthcare Group, Ltd., 939 So. 2d 185, 187 (Fla. 5th DCA 2006) ("The tort principle of respondeat superior makes an employer liable to third parties for the negligence of an employee, whom he controls and directs." (emphasis omitted)).

The first duty the Zivojinovichs assert would be inconsistent with Florida law, which permits the operator of a hotel to "remove or cause to be removed . . . any guest . . . [who] is intoxicated, profane, lewd, or brawling[] [or] who indulges in any language or conduct which disturbs the peace and comfort of other guests or which injures the reputation, dignity, or standing of the establishment." Fla. Stat. §

14

509.141(1). Section 509.141(2) does require that the operator "notify such guest that the establishment no longer desires to entertain the guest and . . . request that such guest immediately depart from the establishment . . . . [either] orally or in writing," but that notification may be done by a law enforcement officer. See State v. Williams, 751 So. 2d 170, 172 (Fla. 2d DCA 2000) (stating that motel guest was lawfully ejected under Fla. Stat. § 509.141 when a police officer notified him that the motel wanted him to leave).

The Zivojinovichs argue that it is a jury question whether Justin's actions gave the Ritz the right to eject him under the Florida statute. We disagree. There is no genuine issue of material fact about whether his behavior was "profane," "lewd," "disturb[ed] the peace and comfort of other guests," or "injure[d] the reputation, dignity, or standing" of the Ritz. See Fla. Stat. § 509.141(1). Dragging a woman away from the man with whom she is dancing "disturbs [her] peace and comfort." See id. Bending over to display one's rear to the band at a black tie event "injures the . . . [Ritz's] dignity." See id. Justin telling a hotel employee to "fucking leave [him and his family] alone" is profane. See id. The Ritz had the right to eject Justin, so Barner did not breach any duty by having law enforcement notify Justin that he was no longer welcome at the event and escort him off the property.

15

The second duty that the Zivojinovichs assert Barner and the Ritz breached was a duty to give truthful information to law enforcement. The Zivojinovichs point out three sets of statements that they claim breached this duty: (1) Barner's statement in his call to the Sheriff's Department; (2) Sorrell's statements in her call to the Sheriff's Department; and (3) Barner's statements to Deputy Knott when they spoke in the Ritz ballroom. The elements of a negligence claim under Florida law are: (1) a legal duty on the defendant to protect the plaintiff from particular injuries; (2) the defendant's breach of that duty; (3) the plaintiff's injury being actually and proximately caused by the breach; and (4) the plaintiff suffering actual harm from the injury. Clay Elec. Coop., Inc. v. Johnson, 873 So. 2d 1182, 1185 (Fla. 2003).

Barner, Sorrell, and the Ritz had a duty to tell the truth when speaking to law enforcement about Justin. Florida courts have held that, under certain circumstances, a party that gives inaccurate statements to police can be liable for negligence. See Townsend v. Westside Dodge, Inc., 642 So. 2d 49 (Fla. 1st DCA 1994); Harris v. Lewis State Bank (Harris III), 482 So. 2d 1378, 1384–85 (Fla. 1st DCA 1986). The decision with facts most similar to the present one on this point involved a woman, Jessie Mae Harris, who was incorrectly informed by bank employees that she was entitled to the money in a certain account, even though she

16

told them that she did not have an account at the bank. Harris v. Lewis State Bank (Harris I), 436 So. 2d 338, 339 (Fla. 1st DCA 1983) (recounting the facts underlying the decision in Harris III). After Harris withdrew the money from the account, the real owner reported the theft to the police. Id. When interviewed, the bank employees did not disclose to the police or the prosecutor that they had told Harris that she was entitled to the money. Id. After being prosecuted for grand larceny and acquitted, Harris sued the bank and the police for malicious prosecution and negligence. Harris III, 482 So.2d at 1379; Harris I, 436 So. 2d at 340. The Florida appeals court reversed the trial court's dismissal of the negligence claim against the bank, holding that the "relationship voluntarily entered into by the bank . . . created a duty on the part of the bank to protect [Harris] from false accusations of forgery and theft." Id. at 1385. The voluntary relationship, presumably created by informing Harris that she was entitled to the money, and the bank's knowledge that failing to disclose that fact would "likely . . . result in injury to" Harris created the duty to fully and accurately inform the police. Id. at 1384–85.

The situation in the Harris case is similar to the one here. The Harris III decision held that the bank had incurred a duty to Harris when it caused her to believe that she had a legal right to the money in the account. Likewise, the Ritz

17

incurred a duty to Justin when it sold him a ticket to the New Year's Eve party because a hotel has "a continuing legal duty to its patrons to use ordinary care to . . . protect them from harm due to reasonably foreseeable risks of injury." Hardy v. Pier 99 Motor Inn, 664 So. 2d 1095, 1097 (Fla. 1st DCA 1995). When the bank employees failed to disclose to the police that they had told Harris that she was entitled to the money, they knowingly put her at risk of being wrongfully prosecuted. Likewise, when Barner and Sorrell allegedly lied to the dispatcher and when Barner allegedly lied to Deputy Knott, they knowingly put Justin at greater risk of physical injury because it became more likely that the deputies would use force in removing Justin from the premises if they believed that Justin had indicated that someone would have to force him to leave. Whether that increased likelihood is enough to satisfy the causation element is a separate question that we address below. We conclude that, under Florida law, Barner and the Ritz had a duty not to lie to law enforcement in a way that increased the risk that a guest would suffer injury.

Sorrell breached this duty when she said that "disorderly people" were "just basically trashing the place[,] . . . jumping on furniture, [and] ripping things apart" because this was untrue and, by exaggerating the severity of Justin's misbehavior, she increased the risk that the deputies would use force to remove him from the

18

premises. Barner breached this duty by lying to Deputy Knott, falsely telling him that, in response to being informed that he would be removed if he went on stage again, Justin had told him to "[f]uck off" and had challenged Barner's or the Sheriff's Office's ability to do anything about his behavior. Also, Barner lied to the dispatcher when he called the Sheriff's Office, saying that when he tried to warn Justin, Justin "started yelling profanities, screaming, yelling and carrying on." While Justin's behavior was inappropriate, he and Barner had not yet spoken when Barner called the Sheriff's Office, therefore Justin could not have "started yelling profanities, screaming, yelling and carrying on" in response to Barner's nonexistent admonition.

The third element of the Justin's negligence claim is that Barner and/or Sorrell's lies were the actual and proximate cause of his injuries. Clay Elec. Coop., Inc., 873 So. 2d at 1185. The actual causation inquiry requires us to determine whether a reasonable jury could find that, but for Sorrell's and Barner's lies, Justin would not have been injured or would not have been injured as severely. Justin has not created a genuine issue of material fact that Sorrell's call was a cause of the Justin's injuries, because there is no evidence in the record to show that what she said was ever communicated to any of the deputies who eventually responded. A factfinder could find, however, that at least one falsehood from Barner's call did

19

make it through to Deputies Russell and Knott. There is evidence that they were told that two men were causing a disturbance by being unruly and uncooperative and getting on stage. Although Justin, Alex, and Justin's friend did get on stage and were arguably unruly, no one had yet asked any of them to stop being disruptive, so they could not have been uncooperative. Even if the deputies had not heard anything before arriving, Barner's embellishments to Knott may have created a false mix of information presented to the deputies, which necessarily affected their decision about when force was reasonable and necessary. See generally Saucier v. Katz, 533 U.S. 194, 207, 121 S. Ct. 2151, 2159 (2001) ("Excessive force claims . . . are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred."). A jury could find that, but for Barner falsely telling Knott that Justin had responded belligerently to the threat of sheriff's deputies being called, Justin would not have been injured or that his injuries would not have been as severe.

The closer issue is whether the false information given to law enforcement by Barner was the proximate cause of Justin's injuries. If a reasonably prudent person could foresee that a harm like the one that the plaintiff suffered might result from his or her actions, then there is proximate causation. See Goldberg v. Fla. Power & Light Co., 899 So. 2d 1105, 1116 (Fla. 2005). Barner and the Ritz argue

20

that Barner could not be the proximate cause of Justin's injuries because the deputies' actions and those of the Zivojinovichs themselves were unforeseeable. In support of their position, they rely on Florida cases that hold that there is generally no liability for the acts of third persons. See, e.g., Trianon Park Condominium Ass'n v. City of Hialeah, 468 So. 2d 912 (Fla. 1985); Allen v. Babrab, Inc., 438 So. 2d 256 (Fla. 1983). However, under Florida law, when an "independent intervening cause is a foreseeable and probable consequence of the wrongful actions of the defendant," the defendant can be liable. Guice v. Enfinger, 389 So. 2d 270, 271 (Fla. 1st DCA 1980); see Goldberg, 899 So. 2d at 1116. This principle includes a defendant's negligence that later results in injuries from police officers executing their duties. See Townsend, 642 So. 2d 49; Harris III, 482 So. 2d at 1384–85.

In Townsend a car dealership accidentally affixed a magnetic dealer's tag to the wrong vehicle and, not knowing where it was, had the loss reported to the police. Townsend, 642 So. 2d at 50. The police logged the tag as being stolen instead of simply lost. Id. A woman purchased the vehicle with the supposedly stolen tag. Id. That evening, a police officer noticed the vehicle, ran the tag number, discovered it was reported stolen, and arrested the woman. Id. During the arrest, the woman was handcuffed, which aggravated a preexisting shoulder injury.

21

Id. The dealership's negligence in permitting the woman to leave the lot with the lost tag was held to be a proximate cause of her shoulder injury because it "set in motion a series of events culminating in the stop of [the woman]'s vehicle[,] [and,] . . . [u]nder the circumstances, the action of the police in both detaining and arresting the driver . . . [was] reasonably within the scope of the danger that could result from [the dealership]'s negligent action." Id. at 51.

As in Townsend, in this case the allegedly wrongful conduct of a party—here Barner, there the dealership—caused law enforcement officials to initiate an encounter in which the plaintiff was injured. In Townsend there was no particular reason to believe that the arresting officer would use force or injure the plaintiff, but the Florida appeals court still found that the causation element was met. Here, by contrast, Barner made Justin's encounter with law enforcement more likely to be violent by falsely telling Deputy Knott that Justin had stated an intention to resist the deputies. For that reason, there is arguably a stronger causal connection in this case than there was in Townsend. A reasonable factfinder could conclude that Barner's alleged lies caused or exacerbated Justin's injuries.

The final element necessary to make out a negligence claim is that the defendant's breach results in an actual harm. Clay Elec. Coop., Inc., 873 So. 2d at 1185. The deputies repeatedly shot Justin with a taser gun, and the pain and

injuries he suffered are actual harms.

Having found that Barner had a duty not to lie to law enforcement in a way that made it more likely that the Ritz's guests would be hurt, that he allegedly breached that duty, and that a reasonable jury could find that his breach was the actual and proximate cause of Justin's injuries, we conclude that the district court erred in granting Barner summary judgment. And, if Barner is not entitled to summary judgment, then the Ritz, which is vicariously liable for torts committed by Barner in the scope of his employment, is not either. See Pope, 939 So. 2d at 187.

## V.

The Zivojinovich's fourth contention is that the district court erred in granting summary judgment to Barner and the Ritz on Alex's negligence claim. Their argument is that Barner's negligence led to Alex's injuries because Alex was hurt while attempting to rescue Justin. While they are correct that Florida law recognizes the rescue doctrine, which holds a tortfeasor liable for injuries to a third party who is hurt in an attempt to rescue the direct victim of the tortfeasor, see Zwinge v. Hettinger, 530 So. 2d 318, 323 (Fla. 2d DCA 1988), they have not convinced us that doctrine applies to Alex. The rescue doctrine will only permit recovery if "the attempted rescue is not recklessly or rashly done" and the rescuer

23

does not "contribute to his [own] peril by placing himself in a position of danger not necessary to effect the rescue." Rose v. Peters, 82 So. 2d 585, 586 (Fla. 1955); Reeves v. N. Broward, 821 So. 2d 319, 321 (Fla. 4th DCA 2002) ("For the rescue doctrine to come into play . . . the rescuer must have acted reasonably.").

Alex's effort to rescue his son consisted of trying to push past Deputy Stanford and cover Justin's body with his own. That happened after Deputy Knott had pointed a taser gun at Alex and told him not to interfere. Attempting to get between a law enforcement officer and an apparently noncompliant suspect is both reckless and rash. Alex's actions unreasonably escalated an already volatile situation, increasing the risk to everyone and making his rescue attempt counterproductive. We conclude that Alex cannot invoke the rescue doctrine. Without it he cannot make out a claim against Barner and the Ritz for negligence. Therefore, the district court was correct to grant summary judgment to Barner and the Ritz on Alex's negligence claim.

## VI.

The Zivojinovichs' fifth and final contention is that the district court erred by finding that the deputies did not use excessive force in violation of the Fourth Amendment and that, even if they did, they were entitled to qualified immunity. The Zivojinovichs argue that the deputies used excessive force once against Justin

24

and once against Alex. The alleged excessive force against Justin occurred when Deputies Knott and Stanford held Justin's arms as they escorted him out of the Ritz. The alleged excessive force against Alex occurred when Deputy Knott and an unnamed sheriff's deputy used their taser guns on him when he was handcuffed and being led to the deputies' cars. The Zivojinovichs do not contend on appeal that the deputies used excessive force during the fight in the stairwell.

Qualified immunity shields public officials from suits against them in their individual capacities for torts committed while performing discretionary duties unless the tortious act violates a clearly established statutory or constitutional right. Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982). The parties agree that the deputies were engaged in a discretionary duty while escorting Justin off of the Ritz's property, so the burden is on the Zivojinovichs to show why the deputies are not entitled to qualified immunity. Dahl v. Holley, 312 F.3d 1228, 1233 (11th Cir. 2003).

Qualified immunity requires a two-step inquiry. The threshold question is whether "[t]aken in the light most favorable to the party asserting the injury, . . . the facts . . . show the officer's conduct violated a constitutional [or statutory] right." Saucier, 533 U.S. at 201, 121 S. Ct. at 2156. When, as here, qualified immunity "arises in the posture of a motion for summary judgment, we are

25

required to view all facts [in the record] and draw all reasonable inferences in favor of the nonmoving party." Brosseau v. Haugen, 543 U.S. 194, 195 n.2, 125 S. Ct. 596, 597 n.2 (2004). Then, "if a violation could be made out on a favorable view of the parties' submissions, the next, sequential step is to ask whether the right was clearly established." Saucier, 533 U.S. at 201, 121 S. Ct. at 2156.

Turning to Justin's excessive force claim, we first consider whether a reasonable jury could find that there was a Fourth Amendment violation. Because even de minimis force will violate the Fourth Amendment if the officer is not entitled to arrest or detain the suspect, see Bashir v. Rockdale County, Ga., 445 F.3d 1323, 1332 (11th Cir. 2006), we must first determine whether the deputies had probable cause to arrest Justin.

Florida law makes it a first degree misdemeanor to "resist, obstruct, or oppose any officer . . . in the execution of legal process or in the lawful execution of any legal duty, without offering or doing violence to the person of the officer." Fla. Stat. § 843.02. The two elements of resisting arrest without violence are: (1) "the officer must be engaged in the lawful execution of a legal duty"; and (2) "the defendant's action, be it by words, conduct or a combination thereof, must constitute obstruction or resistance of that lawful duty." N.H. v. State, 890 So. 2d 514, 516–17 (Fla. 3rd DCA 2005). "Legal duties" encompass more than just

26

making arrests. Jacobson v. State, 476 So. 2d 1282, 1287 (Fla. 1985) ("[S]ection 843.02 . . . does not require that the officer be attempting to arrest the suspect.").

Here, the deputies were lawfully executing their legal duty by informing Justin that he was no longer allowed to be on the Ritz's property, escorting him out, and giving him a trespass warning. See Williams, 751 So. 2d at 172. Before escorting Justin out, the deputies told him to sit. He did for a moment, but then he stood up again. Deputy Stanford had to order him to sit again. In N.H., the Florida appeals court affirmed a conviction for resisting an officer without violence in the case of a juvenile suspect who was agitated and aggressive, cursed, "refused a police request to sit down," and "menacingly raised his fists at" officers investigating a crime. Id. at 515–16. Like the defendant in N.H., Justin disobeyed a command by members of law enforcement to sit while they executed their lawful duties. Although Justin's actions were not as egregious as those of the defendant in N.H., the standard for probable cause is significantly lower than the proof-beyond-a-reasonable-doubt standard applied to convictions. See Lee v. Ferraro, 284 F.3d 1188, 1195 (11th Cir. 2002) ("Although probable cause requires more than suspicion, it does not require convincing proof, and need not reach the [same] standard of conclusiveness and probability as the facts necessary to support a conviction."). We conclude that the deputies had probable cause to arrest Justin

27

for resisting arrest without violence.

That conclusion, however, does not end our inquiry. We must now determine whether the force used was unreasonable. "The 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officer's actions are 'objectively reasonable' in light of the facts and circumstances confronting him, without regard to his underlying intent or motivation." Kesinger v. Herrington, 381 F.3d 1243, 1248 (11th Cir. 2004). "In order to determine whether the amount of force used by a police officer was proper, a court must ask 'whether a reasonable officer would believe that this level of force is necessary in the situation at hand.'" Lee, 284 F.3d at 1197 (11th Cir. 2002) (citation omitted). This must be decided "on a case-by-case basis from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Post v. City of Fort Lauderdale, 7 F.3d 1552, 1559 (11th Cir. 1993) (internal quotation marks omitted).

During his deposition, Justin testified that Deputy Knott's grip on his arm did not hurt. As such, it was de minimis. De minimis force will only support a Fourth Amendment excessive force claim when "an arresting officer does not have the right to make an arrest." Bashir, 445 F.3d at 1332. However, as we have just discussed, there was probable cause to arrest Justin for resisting an officer without

28

violence, so de Knott's grip cannot be the basis for an excessive force claim. See Nolin v. Isbell, 207 F.3d 1253, 1257 (11th Cir. 2000) ("[T]he application of de minimis force, without more, will not support a claim for excessive force in violation of the Fourth Amendment.").

With regard to Deputy Stanford, Justin testified that she pulled his arm up at an uncomfortable angle while escorting him out. We conclude that, from the perspective of a reasonable deputy in Stanford's position, this was not an unreasonable use of force. Stanford knew that Justin had caused a disturbance, was going to be escorted out of the hotel, and had disobeyed her instruction to remain seated. Under these circumstances, using an uncomfortable hold to escort an uncooperative and potentially belligerent suspect is not unreasonable. See Rodriguez v. Farrell, 280 F.3d 1341, 1345 (11th Cir. 2002) (holding that, when arresting an unresisting suspect believed to have outstanding warrants on drug charges, "grabb[ing] [a suspect's] left arm, twist[ing] it behind [his] back, and forced it up to just below the shoulder-blade" was not excessive force even when the suspect screamed with pain).

The district court did not err in granting summary judgment to Deputies Knott and Stanford on Justin's excessive force claims against them. Because we conclude that there was no Fourth Amendment violation, we need not address the

second prong of the qualified immunity analysis.

The Zivojinovichs also argue that Deputy Knott and the other deputy who held Alex as he was being led out of the Ritz in handcuffs used excessive force when they used their taser guns on him. The deputies clearly had probable cause to arrest Alex for resisting an officer with violence, a violation of Fla. Stat. § 843.01, so the only issue here is whether the use of the taser guns was unreasonable. At the time the deputies used their taser guns, Alex's nose had already been broken, and he sprayed blood when he spoke. Knott testified that he believed it was intentional. Although we view the facts in the light most favorable to the non-moving party, Tinker, 429 F.3d at 1326, and Alex testified in his deposition that it was not intentional, we must treat it as though it were because the evidence is that is how it would appear to a reasonable officer at the scene. See Post, 7 F.3d at 1559. We have previously held that in a "difficult, tense and uncertain situation" the use of a taser gun to subdue a suspect who has repeatedly ignored police instructions and continues to act belligerently toward police is not excessive force. Draper v. Reynolds, 369 F.3d 1270, 1278 (11th Cir. 2004). This was such a situation, and we conclude that Knott's use of his taser gun was reasonably proportionate to the need for force. Because Knott's use of the taser gun while leading Alex out of the Ritz in handcuffs was not unreasonable, we do not reach

30

the well-established prong of the qualified immunity analysis.

## VII.

We REVERSE the district court's grant of summary judgment to the Ritz-Carlton Hotel and Frank Barner on Justin Zivojinovich's negligence claim and AFFIRM the remainder of the district court's judgment. The case is REMANDED for further proceedings consistent with this opinion.

AFFIRMED in part, REVERSED in part, and REMANDED.